# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| THOMAS AND BETTS POWER SOLUTIONS, LLC d/b/a JT PACKARD & ASSOCIATES, | Court File No. 10-cv-00213 |
| Plaintiff, | |
| vs. | **COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** |
| S.R. BRAY L.L.C. d/b/a POWERPLUS!, James NOLDEN, Sandy SCHIELE, Chris BLODGETT, Jim UHALT, Scott BOWMAN, Patricia EPSTEIN, Michele MARTIN, Shane WOLFRAM, Jennifer WINGERT, Sarah SULLIVAN, Kristi RUE, Samantha MOYES and John ROIDT, | |
| Defendants. | |

Plaintiff Thomas & Betts Power Solutions, L.L.C. by and through its attorneys, files this Complaint against defendants S.R. BRAY L.L.C. D/B/A POWERPLUS!, James NOLDEN, Sandy SCHIELE, Chris BLODGETT, James UHALT, Scott BOWMAN, Patricia EPSTEIN, Michele MARTIN, Shane WOLFRAM, Jennifer WINGERT, Sarah SULLIVAN, Kristi RUE, Samantha MOYES and John ROIDT ("Individual Defendants") and alleges as follows:

## INTRODUCTION

S.R. Bray L.L.C. d/b/a POWERPLUS ("POWERPLUS!") has engaged in a nefarious campaign to unlawfully compete with Thomas & Betts Power Solutions, L.L.C. d/b/a JT Packard ("JT Packard") ever since that entity bought the assets of JT Packard at a receivership auction earlier this year. The principals of S.R. Bray formerly owned JT Packard until Bray was forced into bankruptcy late last year. In connection with the sale of assets to Thomas & Betts Power Solutions, certain JT Packard employees' employment ended, including defendants NOLDEN,

EPSTEIN, and BOWMAN.  Both before the end of their employment, and since that time, NOLDEN, in concert with POWERPLUS! and other Individual Defendants, have attempted to and have unlawfully injured Plaintiff's business by:  (1) misappropriating Plaintiff's confidential and trade secret information for the benefit of POWERPLUS!, including, in some cases forwarding 100's of e-mails from their JT Packard e-mail accounts to personal e-mail accounts in the eve of their departure from JT Packard; (2) soliciting customers with whom they conducted business on behalf of JT Packard during the year preceding the end of their employment, in violation of non-solicitation and non-competition agreements; (3) disclosing Plaintiff's confidential and proprietary information to PowerPlus! to facilitate the latter's unlawful competition with Plaintiff's; (4) tortiously interfering with Plaintiff's relationships with both its customers and employees; (5) breaching duties of loyalty and fiduciary duties.  NOLDEN has made his malicious intent clear by communicating to JT Packard his intent to "destroy" it. Plaintiff requests injunctive relief to stop this and other unlawful conduct for which there is no adequate remedy at law, and damages to address the other violations.

## NATURE OF THE ACTION

1.     This is an action to redress unlawful conduct by former JT Packard & Associates ("JT Packard") employees, NOLDEN, BOWMAN, EPSTEIN, SCHIELE, BLODGETT, UHALT, MARTIN, WOLFRAM, WINGERT, SULLIVAN, RUE, MOYES and ROIDT, and their current employer POWERPLUS!.  Plaintiffs seek relief against the Individually-Named defendants for breaching Non-Competition, Non-Solicitation, and Non-Disclosure agreements with them, breaching their duties of loyalty and fiduciary duties, misappropriating trade secret and other confidential and proprietary information.  Plaintiff also seeks relief against POWERPLUS! for its tortious interference with Plaintiff's contractual relationships, tortious

interference with its business expectancy, common law unfair competition and theft of trade secrets, and its aiding and abetting of former JT Packard employees' breaches of their duty of loyalty and fiduciary duties, and breach of Plaintiff's rights arising out of the individually-named defendants' non-competition, non-disclosure, and non-solicitation agreements with Plaintiff.

## PARTIES

2.    Thomas & Betts Power Solutions, L.L.C., ("TBPS") is a Delaware limited liability company with its principal place of business at 5900 Eastport Blvd, Building V, Richmond, Virginia 23231 and is a wholly-owned subsidiary of Thomas & Betts Corporation. In addition to other lines of business, TBPS does business as JT Packard at 275 Investment Circle, Verona, Wisconsin 53593. TBPS is a large independent provider of critical power services to customers throughout the country. JT Packard specializes in the provision of uninterruptible power services to a variety of commercial enterprises throughout the country. JT Packard's primary revenue stems from contracts to provide uninterruptible power service equipment, batteries, generators, and technical services to its customers.

3.    TBPS is, and at all times mentioned was, authorized to do business in Wisconsin.

4.    On January 26, 2010 TBPS purchased substantially all of the operating assets of JT Packard & Associates, Inc.

5.    S.R. Bray L.L.C. is a Nevada limited liability company doing business as POWERPLUS! and whose principal place of business is located at 1210 N. Red Gum Street, in the City of Anaheim, California 92806. POWERPLUS! conducts business within the State of Wisconsin. POWERPLUS! is engaged in the business of providing temporary power solutions, including the provision of generators and power poles, and utility consulting design and installation, to a wide variety of market segments including the utility, construction and event industries. POWERPLUS! is a direct competitor of Plaintiff in the power services industry.

3

6.      Steven R. Bray is the principal of S.R. Bray L.LC.  Bray previously was President of JT Packard & Associates before that entity was placed into receivership and its assets were sold to TBPS.

7.      Keith Bjelajac is the Chief Financial Officer of PowerPlus! and formerly held that same role at JT Packard & Associates prior to the asset sale.

8.      Upon information and belief, NOLDEN is a resident of Wisconsin, residing at 2947 Leadville Pass, Blue Mounds, WI 53517. NOLDEN worked at JT Packard & Associates from approximately March 6, 2006 until January 26, 2010.

9.      Upon information and belief, SCHIELE is a resident of Ohio, residing at 2830 Barharbor Ct., Lewis Center, OH, 43035.  SCHIELE was employed out of JT Packard's Verona, Wisconsin location from approximately September 2, 2008  through March 24, 2010.

10.      Upon information and belief, BLODGETT is a resident of Wisconsin, residing at 16507 Oak Hill Trail, Muskego, WI 43150. BLODGETT was employed by JT Packard from approximately August 15, 2005 to April 16, 2010.

11.      Upon information and belief, UHALT is a resident of Wisconsin, residing at 442 Ineichen Drive, Verona, WI 53593. UHALT was employed by JT Packard from approximately July 23, 2008  through April 5, 2010.

12.      Upon information and belief, BOWMAN is a resident of Indiana, residing at 15068 Windsor Lane, Noblesville, IN 46060. BOWMAN was employed out of JT Packard's Verona, Wisconsin location from approximately July 25, 2006 through January 26, 2010.

13.      Upon information and belief, EPSTEIN is a resident of Wisconsin, residing at 3463 Whytecliff Way, Sun Prairie, WI 53590. EPSTEIN was employed by JT Packard from approximately September 5, 2006  through January 26, 2010.

14.    Upon information and belief, MARTIN is a resident of Wisconsin, residing at 1804 Fjord Pass, Mount Horeb, 53572. MARTIN was employed by JT Packard from approximately October 22, 2007 through February 24, 2010.

15.    Upon information and belief, WOLFRAM is a resident of Wisconsin, residing at 5206 Preservation Place, Sun Prairie, WI 53590. WOLFRAM was employed by JT Packard from approximately October 20, 2008 through March 17, 2010.

16.    Upon information and belief, WINGERT is a resident of Wisconsin, residing at 7328 Santa Fe Trail, Madison, WI 53719. WINGERT was employed by JT Packard from approximately August 29, 2005 through March 23, 2010.

17.    Upon information and belief, SULLIVAN is a resident of Wisconsin, residing at 239 Kelvington Drive, Sun Prairie, WI 53590. SULLIVAN was employed by JT Packard from approximately November 2, 2009 through March 24, 2010.

18.    Upon information and belief, RUE is a resident of Wisconsin, residing at 4435 Pikes Peak Road, Ridgeway, WI 53582. RUE was employed by JT Packard from approximately September 5, 2007 through March 30, 2010.

19.    Upon information and belief, MOYES is a resident of Wisconsin, residing at 119 Faircrest Court, Verona, WI 53593. MOYES was employed by JT Packard from approximately April 4, 2005 through April 1, 2010.

20.    Upon information and belief, ROIDT is a resident of Wisconsin, residing at 2979 Door Creek Road, Stoughton, WI 53589. ROIDT was employed by JT Packard from approximately November 7, 2005 through April 6, 2010.

## JURISDICTION AND VENUE

21.    This Court has original jurisdiction over this action based on diversity of citizenship as set forth in 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because the some of the individually-named defendants reside in this district and a substantial part of the events giving rise to the claims asserted herein occurred in this district.

## FACTS COMMON TO ALL COUNTS

**A.    The Background: Relationship Between JT Packard and POWERPLUS!**

23.    JT Packard is engaged in the business of providing critical power services, including uninterrupted power services and equipment, including batteries and generators, to customers throughout the country, including those in the State of Wisconsin.

24.    S.R. Bray, L.L.C. d/b/a POWERPLUS!, like JT Packard, provides critical power services and equipment to customers throughout the country, including Wisconsin.

25.    JT Packard was formerly a wholly-owned subsidiary of S.R. Bray Corporation. On July 22, 2009, a group of creditors (including the former owner of JT Packard) filed a petition for involuntary bankruptcy under Chapter 7 of the Bankruptcy Code against S.R. Bray Corporation in the United States District Court for the Central District of California, Case No. 8:09-17395 ("Bankruptcy Proceeding")

26.    In connection with the Bankruptcy Proceeding, S.R. Bray Corporation's sole asset, JT Packard, was placed into receivership, which proceedings commenced on November 24, 2009, in the Circuit Court of Dane County, Case No. 09-CV-5940 (the "Receivership Proceeding").

27.     As a result of the Receivership Proceedings, the operating assets of JT Packard were sold to TPBS via auction held on January 19, 2010.  The receivership estate and TBPS completed the sale and purchase of the operating assets of JT Packard on January 26, 2010.  Since that time, TBPS has conducted business as JT Packard.

28.     Pursuant to the Asset Purchase Agreement by and between TBPS and the receivership estate, TBPS acquired "all of the right, title, and interest in, to and under all of the assets, properties and rights of every kind (whether tangible or intangible) that were owned, leased, licensed, used, or held for use" by JT Packard.

29.     The restrictive covenants described herein are among the assets TBPS purchased from the JT Pachard receivership estate.

30.     On or around January 19, 2010, the Court in the receivership proceedings entered an order approving the sale of JT Packard's assets free and clear of all liens, encumbrances, and interests, with all liens, claims, encumbrances, and interests attaching to the proceeds of the sale.  The Court also authorized the disbursement of sale proceeds at that time.

31.     Shortly thereafter, it is believed that POWERPLUS! hired NOLDEN, EPSTEIN, and BOWMAN and began a process of inducing those three and other former JT Packard employees to resign their employment, misappropriate trade secrets and other confidential information, and breach non-solicitation, non-disclosure, and non-compete agreements for the stated purpose to "destroy" JT Packard.  NOLDEN, in fact, as well as at least some of the other named defendants, began working for POWERPLUS! before their employment with JT Packard ended.

**B.     The Individual Defendants' Employment At JT Packard**

32.     On March 6, 2006, JT Packard hired NOLDEN as Vice President of Equipment Sales and Business Development.  NOLDEN worked in JT Packard's Verona office in that capacity until his employment ended on January 26, 2010. During his employment, NOLDEN's job duties as included, *inter alia*: overall responsibility for equipment sales at JT Packard, including the supervision of four other Business Development Executives, soliciting and developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard.  NOLDEN supervised the entire sales force, and reported directly to Steven R. Bray, the former President of JT Packard.

33.     On or about September 2, 2008, JT Packard hired SCHIELE as a Business Development Executive.  SCHIELE worked in JT Packard's Verona office in that capacity until her voluntary resignation on March 24, 2010.  During her employment, SCHIELE's job duties as Business Development Executive included general sales support, soliciting and developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard.

34.     On or about August 15, 2005, JT Packard hired BLODGETT for the position of Sales Application Engineer.   BLODGETT worked in JT Packard's Verona office until his voluntary resignation on April 16, 2010.  During his employment, BLODGETT's job duties as Sales Application Engineer included, *inter alia*: supporting client relationship with respect to technical expertise in various IT areas relating to the sales function, soliciting and developing new client relationships; maintaining business relationships with existing clients; developing and

maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard.

35.    On or about June 23, 2008, JT Packard hired UHALT for the position of Business Development Executive.  UHALT worked in JT Packard's Verona office until his voluntary resignation on April 5, 2010.  During his employment, UHALT's job duties as Business Development Executive included, *inter alia*:  soliciting and developing new client relationships; maintaining business relationships with existing clients (including properly management firm clients, among Plaintiff's largest); developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard.

36.    On or about July 25, 2005, JT Packard hired BOWMAN as its Area Service Director. BOWMAN worked remotely out of JT Packard's Verona office until his employment ended on January 26, 2010.  During his employment, BOWMAN's job duties as Area Service Director included, *inter alia*: the management of JT Packard's Regional Managers and field engineers (i.e, those employees who performing service and maintenance calls at customer sites), and maintaining customer relationships with the end-users clients.

37.    On or about September 5, 2006, JT Packard hired EPSTEIN as its Director of Field Service Operations. EPSTEIN worked in JT Packard's Verona office until her employment ended on January 26, 2010.  During her employment, EPSTEIN's job duties as Director of Field Service included, *inter alia*: supervision of field service managers and field service engineers and serving as a customer liaison with respect to the services provided to customers by the field service engineers.

38.    On or about October 22, 2007, JT Packard hired MARTIN as its Customer Service Supervisor. MARTIN worked in JT Packard's Verona office until her voluntary resignation on February 24, 2010.  During her employment, MARTIN 's job duties as Customer Service Supervisor included, *inter alia*: supervision of 5-6 customer service representatives, and management of the emergency call center.

39.    On or about October 20, 2008, JT Packard hired WOLFRAM as its Director of Equipment Sales.   WOLFRAM worked in JT Packard's Verona office until his voluntary resignation on March 17, 2010.  During his employment, WOLFRAM's job duties as Director of Equipment Sales included, *inter alia*: responsibility for power equipment sales, soliciting and developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard.

40.    On or about August 29, 2005, JT Packard hired WINGERT as its Equipment Sales Coordinator. WINGERT worked in JT Packard's Verona office until her voluntary resignation on March 23, 2010.  During her employment, WINGERT's job duties as Equipment Sales Coordinator included, *inter alia*: general sales support, soliciting and developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard.

41.    On or about November 2, 2009, JT Packard hired SULLIVAN for the position of Marketing Manager.   SULLIVAN worked in JT Packard's Verona office until her voluntary resignation on March 24, 2010.  During her employment, SULLIVAN's job duties as Marketing

Manager included, *inter alia*: advertising and marketing on behalf of JT Packard at trade shows and on the internet, creation of marketing materials, and the generation of customer business.

42.    On or about September 5, 2007, JT Packard hired RUE as the Team Lead of Subcontractor Support. RUE worked in JT Packard's Verona office until her voluntary resignation on March 30, 2010. During her employment, RUE's job duties as Team Lead of Subcontractor Support included, *inter alia*: coordination of subcontractors to fulfill primary service contracts with customers, including the selection, qualification, and bidding of subcontractors, and the negotiation of subcontractor business relationships.

43.    On or about April 4, 2005, JT Packard hired MOYES as the Business Development Coordinator. MOYES worked in JT Packard's Verona office until her voluntary resignation on April 1, 2010. During her employment, MOYES's job duties as Business Development Coordinator included, *inter alia*: developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard.

44.    On or about November 7, 2005, JT Packard hired ROIDT as an Equipment Sales Consultant. ROIDT worked in JT Packard's Verona office until his voluntary resignation on April 6, 2010. During his employment, ROIDT's job duties as Equipment Sales Consultant included, *inter alia*: general sales support, soliciting and developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard.

C.    **Individual Defendants' Restrictive Covenants.**

45.    As a condition to, and in consideration of the Individual Defendants being hired by JT Packard, all except WOLFRAM, entered into: (1) a non-solicitation agreement; (2) a non-disclosure agreement; and (3) a non-competition agreement.  Those agreements provided that each "shall inure to the benefit of any successors or assigns of Employer and shall be enforceable against and/or binding upon any successors, employees, partners, corporations, proprietorships, partnerships, joint ventures, legatees, heirs, and assigns of Employee." See Exs. A-L.

46.    All of the agreements described herein contain a choice-of-law provision designating Wisconsin law and venue in the State or Federal courts of Wisconsin and each one of them contains a severability clause providing that the invalidity of one portion of the agreement shall not affect enforceability of other portions thereof.

47.    In addition, all of the agreements described herein were supported by adequate consideration in that they were signed in connection with the Individual Defendants' hiring by, and receiving training from, JT Packard, plus in certain cases (Rue, Schiele, Sullivan, Uhalt, Blodgett, Wingert, Martin, Moyes) additional severance pay if the employee's termination was other than "for cause."

1.    **Non-Solicitation Agreements**

48.    NOLDEN, BLODGETT, UHALT, BOWMAN, EPSTEIN, MARTIN, WINGERT, MOYES and ROIDT's Non-Solicitation Agreements specifically provide, *inter alia*, as follows:

> For a period of one (1) year following termination (voluntary or involuntary) of Employee's employment with Employer, Employee covenants, promises and agrees that he/she will not solicit on behalf of or for the benefit of any person or entity in competition with Employer, including the Employee, any customer of Employer with which Employee had contact during one (1) year preceding the date of Employee's

termination. For purposes of this Agreement, customer means: (a) any person or entity that purchased any goods or services from Employer within one year prior to the termination of Employee's employment, and (b) any potential customer that Employee ad solicited on behalf of Employer within one (1) year prior to termination of Employee's employment.

49.    SCHIELE, RUE, and SULLIVAN's Non-Solicitation Agreements specifically

provide, *inter alia*, as follows:

> For eighteen (18) months following the end of Employee's employment with the Company, for whatever reason, Employee agrees not to directly or indirectly attempt to sell to any Restricted Customer any products, goods, or services of the type or substantially similar to the type sold or provided by the Employee on behalf of the Company during the twelve (12) months preceding the end, for whatever reason, of Employee's employment with the Company.

> During the term of Employees employment with the Company and for twelve (12) months thereafter, Employee shall not directly or indirectly encourage any Company employee to terminate such employee's employment with the Company or solicit such an individual for employment outside the Company which would end or diminish that employee's services to the Company.

50.    Defendants UHALT, BLODGETT, WINGERT, MARTIN, AND MOYES, in

addition to executing the agreement described in paragraph 48, also executed agreements

containing the language set forth above pertaining to SCHIELE, RUE, and SULLIVAN,

described in paragraph 49.

**2.    Non-Competition Agreements**

51.    NOLDEN, BLODGETT, UHALT, BOWMAN, EPSTEIN, MARTIN,

WINGERT, MOYES and ROIDT's Non-Competition Agreements provided, in part:

> For a period of eighteen (18) months following termination (voluntary or involuntary) of Employee's employment with Employer, Employee convenants, promises and agrees that he/she will not be associated with any organization or person (as owner, agent, employee, consultant, partner or otherwise) which

13

competes with Employer in the portion of Employer's business in which Employee provided services and in the geographical area in which Employee provided services during the eighteen (18) months preceding termination of Employee's employment with Employer.

52.     The Non-Competition Agreements acknowledge that the eighteen (18) month prohibition period is acknowledged to be reasonable and is specifically intended to include such time as is necessary to assign and train a new Employer representative or employee.

53.     The Non-Competition Agreements also make it clear that they are not intended to preclude the Employee from accepting employment or providing services that do not compete with the employer.

54.     SCHIELE, SULLIVAN, and RUE's Non-Competition agreements provided as follows:

> For eighteen (18) months following the end, for whatever reason, of Employee's employment with the Company, Employee agrees not to provide Restricted Services or advice or counsel concerning the provision of such Restricted Services to any Competitor in any geographic area in which Employee provided substantial products or services on behalf of the Company during the twelve (12) months preceding the end, for whatever reason, of Employee's employment.
>
> The term "Restricted Services" means services of the kind Employee provided to the Company during the twelve (12) months preceding the end, for whatever reason, of the Employee's employment with the Company relating to the provision of critical power services, including sales, service, and consulting regarding uninterruptible power supply systems
>
> The term "Competitor" means any business which is engaged in the provision of critical power services, including sales, service and consulting regarding uninterruptible power supply systems, similar to that produced, manufactured, or distributed by the Company during the twelve (12) months preceding the end, for whatever reason, of Employee's employment.

55.     Defendants UHALT, BLODGETT, WINGERT, MARTIN, AND MOYES, in addition to executing the agreement described in paragraph 51, also executed agreements containing the language set forth above pertaining to SCHIELE, RUE, and SULLIVAN, in paragraph 54.

56.    The SCHIELE, RUE, and SULLIVAN Agreements (which Uhalt, Blodgett, Wingert, Martin, and Moyes also executed) further provide:

**Duty of Loyalty:** During the term of the Employee's employment with the Company, the Employee will not: (i) directly or indirectly compete with the Company; (ii) directly or indirectly divert or attempt to divert Customers' or Potential Customers' business from the Company anywhere the Company does or is taking steps to do business; (iii) prepare to directly or indirectly compete against the Company or prepare to divert or attempt to divert Customers' or Potential Customers' business away from the Company.

**3.    Non-Disclosure Agreements**

57.    NOLDEN, BLODGETT, UHALT, BOWMAN, EPSTEIN, MARTIN, WINGERT, MOYES and ROIDT's non-disclosure agreements specifically provide, *inter alia*, as follows:

Employee agrees that, for a period of one (1) year following termination (voluntary or involuntary) of his/her employment with Employer, Employee shall not use, reveal or disclose Employer's Proprietary or Confidential Information, and shall not induce or assist others in obtaining, using, or revealing Employer's Proprietary or Confidential Information, in any manner which is or may reasonably be construed to be to the detriment of Employer.

Without limitation to the provisions... above, Employee expressly agrees that, for a period of one (1) year following termination (voluntary or involuntary) of his/her employment with Employer, Employee shall not use Employer's Proprietary Information in the form of customer identities, contacts, preferences, needs, desires, purchasing histories, or other customer information, for the purpose of soliciting such customers in competition with Employer.  For purposes of this sub-paragraph, customer means: (a) any person or entity that purchases any goods or services from Employer within one year prior to the termination of Employee's employment, and (b) any potential customer of Employer, either identified as such by Employer during Employee's employment or actually solicited by Employer,  within one (1) year prior to termination of Employee's employment, where Employee acquired knowledge of the potential customer during the course of his/her employment with Employer.

58.    Defendant NOLDEN, BLODGETT, UHALT, BOWMAN, EPSTEIN, MARTIN, WINGERT, MOYES and ROIDT's non-disclosure agreements define "confidential" and

"proprietary" information in part to included "any data or information relating to either Employer's business, products, services or customers that is material to Employer and not generally known by the public or disclosed in the public sales literature of Employer." Such information is also defined to include: information relating to business processes and methods, computer hardware and software programs, inventions and discoveries, sales figures and projections, marketing and advertising strategies, methodologies and research, financial information, internal policies and procedures; training practices and methods, and customer information (including information pertaining to the identity of Employer customers, their special demands, preferences and tendencies and their current and anticipated requirements for Employer's products and services).

59.    Defendant SCHIELE, SULLIVAN, and RUE's non-disclosure agreements provide that, for a period of eighteen (18) months following the end of their employment, they shall not "directly or indirectly use or disclose Confidential Information.." The agreements define "Confidential Information" as "all non-Trade Secret information of, about or related to the Company by its customers that is not known generally to the public or the Company's competitors" including: "(i) information about products under development, research, development or business plans, financial information, Customer lists, distribution lists, vendor lists, information about orders from and transactions with Customers, distributors or vendors, sales and marketing strategies and plans, pricing strategies, information relating sources of material and production costs, personnel information, and business records; (ii) information which us marked for otherwise designated as confidential or proprietary by the Company; and (iii) confidential information of customers.

60.     Defendants UHALT, BLODGETT, WINGERT, MARTIN, AND MOYES, in addition to executing the agreement described in paragraph 57, also executed agreements containing the language set forth above pertaining to SCHIELE, RUE, and SULLIVAN, in paragraph 59.

**C.     POWERPLUS! Recruits JT Packard Employees, Aids and Abets Breaches of Various Contractual and Common Law Duties, and Encourages Other Tortious Conduct Designed to "Destroy" JT Packard.**

61.     Shortly after the sale of the JT Packard assets was completed in February 2010, S.R. Bray L.L.C. d/b/a POWERPLUS! was formed to engage in a directly competitive business for the express purpose of injuring JT Packard, and POWERPLUS! then took unlawful steps to injure JT Packard's business.  POWERPLUS! is engaged in the same type of business as JT Packard and even copied the same website design, complete with photographs of JT Packard employees performing work, and representing those photographs as POWERPLUS! employees.

62.     In particular, POWERPLUS! encouraged and directed former JT Packard employees to recruit other JT Packard employees to come to work for POWERPLUS while both were still employed by JT Packard for the specific purpose of injuring Plaintiff.

63.     In addition, POWERPLUS! encouraged, directed, aided, abetted and approved the individually-named defendants' actions of:

a.     competing with JT Packard while still employed by it, and afterwards, in breach of their non-competition agreements;

b.     soliciting clients with whom they had contact during the last year of their employment with JT Packard, in breach of their non-solicitation agreements;

c.     misappropriating confidential and trade secret information; and

d.     tortiously interfering with Plaintiff's customer relationships and employment relationships.

64.    As employees of JT Packard and through the use of its resources, the individually-named defendants had access to and were privy to the following confidential information/trade secrets:

      a.    the identity of clients and vendors;

      b.    the identity of the contact persons at clients who decide or have significant influence regarding which recruiting/placement firms they will use;

      c.    the billing rates and pricing structures JT Packard charges each of its clients (which varied by client and which pricing matrices were specifically developed by JT Packard);

      d.    the power equipment inventory of clients and their needs or potential needs with respect to servicing and/or replacement of such equipment;

      e.    the value of service and equipment contracts with customers;

      f.    the particular idiosyncrasies of each client/contact person including their preferences, likes, and dislikes with respect to power service equipment and service; and

      g.    JT Packard's field service engineer processes, procedures, and training.

65.    The information described in paragraph 64 above is valuable, confidential, and proprietary to Plaintiff, and has significant economic value to Plaintiff, and would be of significant economic value to competitors in the power services industry.

66.    The information described in paragraph 64 above is not generally known in the public domain, not otherwise obtainable from public sources, and constitutes confidential information and trade secrets.

67.    To protect its legitimate business interests with respect to the aforementioned information, JT Packard requires that the individuals it employs sign restrictive covenants, non-

solicitation and non-disclosure agreements as a condition of employment, and have password login to confidential databases/software. It also limits access to that information to only those employees with a business need to know. These constitute reasonable measures to ensure the secrecy of the information in question.

68.    Individuals employed in the same or similar capacities as the Individual Defendants become inexorably and intimately knowledgeable regarding JT Packard's clients, financial information regarding its contracts with those clients, its pricing, products and service methods, marketing and business plans.

69.    Prior to their employment with JT Packard, Individual Defendants had no knowledge of JT Packard's confidential information or trade secrets, *i.e.*, the identity of JT Packard' clients, its contacts for those clients, pricing for various clients, its clients' power equipment needs and inventory, JT Packard's field service training and processes.

70.    In carrying out their job duties, the individually-named defendants had access to proprietary and confidential information, including but not limited to the information described in paragraph 64. In addition, defendant NOLDEN had access to confidential company financial information and business plans, employee and departmental salary information.

71.    As employees of JT Packard and through the use of JT Packard's resources, Individual Defendants developed and maintained relationships with JT Packard's clients.

**Interactions Between POWERPLUS! and Individual Defendants**

72.    Prior to his employment at JT Packard ending, NOLDEN accepted an offer to become Vice President of Sales of POWERPLUS (which was then surreptitiously called "NewCo") by Steven Bray in NOLDEN's offer letter.

73.    During a meeting on the last day of his employment with JT Packard, NOLDEN advised JT Packard's Human Resources manager that he was going to "destroy" JT Packard. NOLDEN reiterated this comment several times during the interview.

74.    NOLDEN, it is believed, misappropriated confidential information from JT Packard prior to the end of his employment, solicited other JT Packard employees to leave JT Packard to go to work for POWERPLUS! and solicited clients from JT Packard while still employed by it.

75.    Both before and immediately following the end of his employment JT Packard, NOLDEN engaged in the following actions on behalf of POWERPLUS!:

a.    solicitation of JT Packard customers with whom he had contact during the last year of his employment with JT Packard and whose relationships with JT Packard preceded his employment with JT Packard.

b.    solicitation of then-current JT Packard employees to come to work for POWERPLUS!

c.    solicitation and gathering of confidential business information of JT Packard through employees of JT Packard.

d.    tortious interference with JT Packard customer relationships,

e.    using JT Packard's confidential business information to solicit current JT Packard employees to solicit customer business on behalf of POWERPLUS!

76.    Upon information and belief, since their respective departures from JT Packard and for the benefit of  POWERPLUS!, SCHIELE, UHALT and NOLDEN have used their intimate, detailed knowledge of JT Packard's confidential client information to solicit current

clients of JT Packard including Via West, Charter, McKinstry, FedEx, Verizon, Agilent, United Healthgroup, and Oracle.

77.    On March 8, 2010, immediately prior to announcing her resignation, SCHIELE forwarded nearly 100 e-mails from her JT Packard e-mail account to her personal e-mail account.  Those emails contained at least the following categories of information:

- Contact information, telephone numbers, names, and addresses of JT Packard customers;

- JT Packard marketing materials;

- JT Packard customer contract and bid information;

- Procedures for maintenance of JT Packard products; and

- Account assignment lists, including customer names, responsible JT Packard employee, customer account value and contract value.

78.    SCHIELE went to work for POWERPLUS! within two weeks after forwarding the emails outlined above.  On information and belief, NOLDEN, on behalf of POWERPLUS!, instructed SCHIELE to bring that information with her to POWERPLUS!.  SCHIELE had no legitimate business reason as far as her work at JT Packard was concerned to forward such information to her personal email account.  In addition, prior to the end of her employment, SCHIELE participated in an interview for the purpose of recruiting a candidate for employment for POWERPLUS!

79.    Contrary to her non-compete and non-disclosure agreements, SCHIELE has failed to return her company-issued laptop computer.  The same is true for defendant BLODGETT.

80.    Prior to their resignations from JT Packard, POWERPLUS! established e-mail accounts for ROIDT and BLODGETT, as well as cell phones, which both utilized before their employment with JT Packard ended, for the benefit of POWERPLUS!

81.    During his employment with JT Packard, BLODGETT communicated with NOLDEN and other key personnel of POWERPLUS! for the purpose of sharing confidential JT Packard information and interfering with JT Packard's business expectancy and contractual relationships.

82.    During his employment with JT Packard, BLODGETT attempted to destroy evidence of his breach of non-solicitation and non-disclosure agreements by deleting communications from his computer and attempting to have his computer "reset" to destroy evidence of his wrongful conduct.

83.    In early April, 2010, JT Packard received a call from a client, Flight Safety International, who indicated, without forewarning, that it was no longer comfortable working with JT Packard, and was moving its contract to another provider.  Several days later, JT Packard received an e-mail confirming that the client planned to move its business to POWERPLUS!. This client was one serviced by BLODGETT, though it was not BLODGETT's client originally. BLODGETT, it is believed, solicited the client to cease doing business with JT Packard and to commence doing business with POWERPLUS!.  When an employee of JT Packard went to locate to documentation relating to the client, including pricing information, such documentation was missing.  On information and belief, in 2009 alone, the value of the business of this client for the period through and including October 30, 2009 was over $350,000.

84.    On April 16, 2010, BLODGETT was scheduled to have an exit interview with JT Packard.  BLODGETT did not appear, nor has he returned his company-owner laptop computer.

85.    Prior to their resignations and during their employment with JT Packard, UHALT and NOLDEN engaged in a series of communications regarding the solicitation of JT Packard customers on behalf of POWERPLUS!, based on confidential information each had learned as a result of their employment with JT Packard.  JT Packard became aware of such communications because NOLDEN e-mailed UHALT and BLODGETT regarding the solicitation of JT Packard clients on behalf of POWERPLUS! while UHALT and BLODGETT were still employed by JT Packard.  NOLDEN indicated that the three of them would plan a trip to Denver the week of April 19, 2010 to accomplish such goals.  In the e-mail, NOLDEN referred to previous efforts by he and SCHIELE to solicit JT Packard business.

86.    Upon information and belief, NOLDEN, SCHIELE, BLODGETT, MARTIN, MOYES and UHALT have used and disclosed JT Packard' confidential proprietary information and trade secrets obtained through their employment with JT Packard.

87.    Specifically, MARTIN forwarded confidential JT Packard information relating to an employee training program, developed by JT Packard, to her home e-mail account from her JT Packard e-mail account shortly before her resignation from JT Packard.  MARTIN had no legitimate business reason with respect to her JT Packard employment to forward such information to her personal e-mail account.  It is believed MARTIN has shared such information with POWERPLUS!

88.    MOYES and WINGERT provided specific client price bidding information they received as a result of their employment with JT Packard to POWERPLUS!.

89.    All individually-named defendants are unfairly competing with Plaintiff and soliciting its clients in the geographic area encompassed by the non-competition and non-

solicitation provisions of their respective Employment Agreements, to the detriment and harm of Plaintiff.

90.    Upon information and belief, individually-named defendants have realized earnings, commissions, and/or other ill-gotten gains from using, soliciting and disclosing confidential information and trade secrets in violation of their respective Agreements with JT Packard.

91.    Upon information and belief, POWERPLUS! has solicited, encouraged, approved and/or ratified Individual Defendants' unlawful actions.

### STATEMENT OF IRREPARABLE INJURY TO PLAINTIFF

92.    Plaintiff has been and continues to be subjected to irreparable injury for which no remedy at law exists.

Given the fierce competition in the power services industry and the sales and revenue at stake, the unlawful actions of the defendants, their agents and those acting in concert with them, are causing and will continue to cause immediate and irreparable harm to Plaintiff's business which cannot be adequately remedied by an award of monetary damages.  The actions described herein are causing and will continue to cause Plaintiff harm and irreparable damage insofar as that conduct interferes with Plaintiff's established business relationships and providing power service and maintenance to customers and prospective customers, interferes with Plaintiff's business opportunities, interferes with candidates or recruiting relationships, and damages Plaintiff's reputation, goodwill and competitive position.  Plaintiff will continue to suffer such injury unless the defendants, their agents and persons acting in concert with them are restrained and enjoined from continuing their unlawful actions.

## COUNT I - BREACH OF CONTRACT (NON-SOLICITATION)
## (NOLDEN, SCHIELE, BLODGETT, UHALT, BOWMAN, EPSTEIN, MARTIN, WINGERT, SULLIVAN, RUE, MOYES and ROIDT)

93.    Plaintiffs restates, re-alleges and incorporates herein by reference each of the foregoing paragraphs.

94.    The conduct and actions of the individually-named defendants as alleged herein constitute a breach of the provisions of their non-solicitation agreements.

95.    As a result of Individual Defendants' breach of these agreements, Plaintiff has been and will continue to be severely and irreparably damaged.

96.    All conditions precedent necessary for the enforcement of these agreements have been satisfied.

97.    Plaintiff will not have an adequate remedy at law for the harm and damage which the Individual Defendants' breach of these agreements will cause.

## COUNT II – BREACH OF CONTRACT (NON-DISCLOSURE)
## (NOLDEN, SCHIELE, BLODGETT, UHALT, BOWMAN, EPSTEIN, MARTIN, WINGERT, SULLIVAN, RUE, MOYES and ROIDT)

98.    Plaintiffs restates, re-alleges and incorporates herein by reference each of the foregoing paragraphs.

99.    The conduct and actions of the individually-named defendants as alleged herein constitute a breach of the provisions of their non-disclosure agreements.

100.    As a result of Individual Defendants' breach of these agreements, Plaintiff has been and will continue to be severely and irreparably damaged.

101.    All conditions precedent necessary for the enforcement of these agreements have been satisfied.

102.    Plaintiff will not have an adequate remedy at law for the harm and damage which the Individual Defendants' breach of these agreements will cause.

## COUNT III – BREACH OF CONTRACT (NON-COMPETITION)
### (NOLDEN, SCHIELE, BLODGETT, UHALT, BOWMAN, EPSTEIN, MARTIN, WINGERT, SULLIVAN, RUE, MOYES and ROIDT)

103.    Plaintiffs restates, re-alleges and incorporates herein by reference each of the foregoing paragraphs.

104.    The conduct and actions of the individually-named defendants as alleged herein constitute a breach of the provisions of their non-competition agreements.

105.    As a result of Individual Defendants' breach of these agreements, Plaintiff has been and will continue to be severely and irreparably damaged.

106.    All conditions precedent necessary for the enforcement of these agreements have been satisfied.

107.    Plaintiff will not have an adequate remedy at law for the harm and damage which the Individual Defendants' breach of these agreements will cause.

## COUNT IV - TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (NOLDEN, SCHIELE, BLODGETT, UHALT, BOWMAN, EPSTEIN, MARTIN, WINGERT, SULLIVAN, RUE, MOYES and ROIDT)

108.    Plaintiff restates, re-alleges and incorporates herein by reference each of the foregoing paragraphs.

109.    Through their employment at JT Packard, Individual Defendants knew of JT Packard' contractual relationships with its clients, prospects and candidates having previously worked with the same clients, prospects and candidates while employed by JT Packard.

110.    Identifiable clients with whom Plaintiff has or had contractual relationships with which Individual Defendants have interfered include, upon information and belief, Flight Safety, United Healthgroup, and Facilities Gateway.

111.    Upon information and belief, Individual Defendants have intentionally, maliciously, and without justification or privilege acted to deprive Plaintiff of existing contractual relationships by, *inter alia*, misappropriating and misusing confidential information.

112.    Individual Defendants' interference with Plaintiff's business was wrongful and tortious.

113.    As a result of the tortious actions by Individual Defendants, Plaintiff has been and will continue to be severely and irreparably damaged.

114.    Plaintiff does not have an adequate remedy at law for the harm and damage suffered as the result of Individual Defendants' tortious interference with Plaintiff's contractual and business relations.

## COUNT V – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF WISCONSIN STAT. § 134.90
### (INDIVIDUAL DEFENDANTS)

115.    Plaintiff restates, re-alleges and incorporates herein by reference each of the foregoing paragraphs.

116.    As a result of their employment with JT Packard, the Individual Defendants have in their possession confidential information of Plaintiff including: Client Contact information, telephone numbers, names, and addresses of customers; Plaintiff's marketing materials; customer contract, subcontract and bid information; procedures for maintenance of Plaintiff's products; field service engineer processes and training programs, account assignment lists, including customer names, responsible sales employee, customer account value and contract value, and other proprietary information relating to Plaintiff's business, the disclosure and misappropriation of which poses a significant threat to Plaintiff's ongoing business.

117.    Plaintiff has made reasonable efforts to maintain the confidentiality of such information.

118.    Plaintiff's confidential information, including but not limited to customer information, has actual and potential independent and economic value to it and is not generally known to nor readily ascertainable by their competitors.

119.    Plaintiff's confidential information, including but not limited to customer lists and information, pricing matrices and service methods and procedures, were developed by JT Packard and constitute "trade secrets" within the meaning of Wisconsin's Uniform Trade Secrets Act (the "Act"), Wis. Stat. § 134.90.

120.    Individual Defendants have violated the Act through their conduct as described above.

121.    As a direct and proximate result of Individual Defendants' violation of the Act, Plaintiff has been and will continue to be severely and irreparably damaged.

122.    This Court has jurisdiction to enjoin the actual or threatened misappropriation of Plaintiff's trade secrets pursuant to the Act, and is authorized to award damages for such misappropriation pursuant to the Act.

## COUNT VI – BREACH OF THE DUTY OF LOYALTY
### (INDIVIDUAL DEFENDANTS)

123.    Plaintiff restates, re-alleges and incorporates herein by reference each of the foregoing paragraphs.

124.    As key employees of JT Packard, Individual Defendants owed JT Packard certain duties, including a duty of loyalty and a duty not to disclose information material to their agency relationships with JT Packard. Individual Defendants stood in confidential relationships to JT Packard.

125.    Prior to and after their departure from JT Packard, Individual Defendants have breached their respective duties of loyalty, including by the acts set forth above, and by generally not acting in the best interests of JT Packard during their employment with it.

126.    As a direct and proximate result of Individual Defendants' breaches of the duty of loyalty, Plaintiff has been severely and irreparably damaged.

127.    Plaintiff will not have an adequate remedy at law for the harm and damage suffered as the result of Individual Defendants' breach of their duty of loyalty to JT Packard.

## COUNT VII – BREACH OF FIDUCIARY DUTY
### (NOLDEN)

128.    Plaintiff restates, re-alleges and incorporates herein by reference each of the foregoing paragraphs.

129.    NOLDEN owed JT Packard a fiduciary duty as a result of his employment.

130.    NOLDEN breached his fiduciary duties by his conduct as outlined above.

131.    As a direct and proximate result of NOLDEN's actions, Plaintiff has been severely and irreparably damaged.

132.    Plaintiff will not have an adequate remedy at law for the harm and damage suffered as the result of NOLDEN's breach of his fiduciary duty to JT Packard.

## COUNT VIII – AIDING AND ABETTING, BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY
### (POWERPLUS!)

133.    Plaintiff restates, re-alleges and incorporates herein by reference each of the foregoing paragraphs.

134.    POWERPLUS! was aware of the agency and other duties owed by the individually-named defendants to JT Packard not only by virtue of the role that POWERPLUS! senior management played at JT Packard prior to the receivership, but also because those same

individuals, Steven Bray and Keith Bjelajac, approved, authorized, and ratified a lawsuit against other former JT Packard employees for breach of fiduciary duty, breach of contract, and unfair business practices.

135.   POWERPLUS! intentionally and wrongfully lent substantial assistance to aid Individual Defendants in breach of their agency and other duties to JT Packard.

136.   As a direct and proximate cause of POWERPLUS! aiding and abetting of Individual Defendants' breach of their agency and other duties, Plaintiff has been severely and irreparably damaged.

137.   Plaintiff will not have an adequate remedy at law for the harm and damage suffered as the result of POWERPLUS! aiding and abetting of Individual Defendants' breach of their agency and other duties to them.

## COUNT IX – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (POWERPLUS!)

138.   Plaintiff restates, re-alleges and incorporates herein by reference each of the foregoing paragraphs.

139.   Plaintiff has valid and enforceable contractual agreements with Individual Defendants.

140.   POWERPLUS! has knowledge of the Agreements because its officers and directors formerly held the same positions with JT Packard at the time Individual defendants signed the Agreements.

141.   Despite their knowledge of the terms of Individual Defendants' post-employment restrictions under the Agreements, POWERPLUS! has intentionally and improperly interfered with Individual Defendants' performance of the Agreements by continuing to employ them and

soliciting, endorsing and/or ratifying their contractual breaches, including the use of JT Packard's confidential information to compete with it.

142.    The actions of POWERPLUS! in causing Individual Defendants to violate the Agreements were and are not justified or privileged.

143.    As a direct and proximate result of POWERPLUS!'s improper interference, without justification or privilege, Plaintiff has been severely and irreparably damaged.

144.    Plaintiff will not have an adequate remedy at law for the harm and damage suffered as the result of POWERPLUS!'s tortious interference with Plaintiff's business relations.

### COUNT X – COMMON LAW MISAPPROPRIATION

145.    Plaintiff restates, re-alleges and incorporates herein by reference each of the foregoing paragraphs.

146.    The conduct and actions of Individual Defendants as alleged herein constitute misappropriation of confidential information in violation of Wisconsin's established common law.

147.    As a result of Individual Defendants' misappropriation, Plaintiff has been and will continue to be severely and irreparably damaged.

148.    Plaintiff will not have an adequate remedy at law for the harm and damage which Individual Defendants' actions have caused.

### PRAYER FOR INJUNCTIVE RELIEF AND DAMAGES

WHEREFORE, Plaintiff demands the following relief:

a.    a temporary restraining order, and a preliminary and permanent injunction prohibiting Individual Defendants from using or disclosing proprietary or confidential information for a period of eighteen months following the end of their respective employment;

b.    a temporary restraining order, and a preliminary and permanent injunction prohibiting all defendants from deleting, destroying, or otherwise spoiling any evidence of any kind relating to the allegations in the complaint;

c.    a temporary restraining order, and a preliminary and permanent injunction prohibiting Individual Defendants from directly or indirectly encouraging any employee to terminate such employment with the Company or to solicit such individuals for employment which would end or diminish their services to Plaintiff;

d.    a temporary restraining order, and a preliminary and permanent injunction prohibiting Individual Defendants from violating their Non-Solicitation agreements.

e.    a temporary restraining order, and a preliminary and permanent injunction prohibiting POWERPLUS! from interfering with Plaintiff's Agreements with Individual Defendants;

f.    a temporary restraining order, and a preliminary and permanent injunction prohibiting Individual Defendants from duplicating or disposing of any confidential or proprietary information or any money received or generated by Individual Defendants following their resignation from JT Packard;

g.    exemplary damages under Wis. Stat. § 134.90;

h.    punitive damages, pursuant to common law;

i.    compensatory damages, in an amount of both the actual loss caused to Plaintiff, and the unjust enrichment realized by POWERPLUS! (including the direct or indirect profits or revenues received by Defendants) from POWERLUS!'s unlawful activities;

j.    costs, including reasonable attorneys' fees; and

k.    such other and further relief as this Court may deem just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all issues properly triable thereby.


Dated this 19th day of April, 2010.


/s Noah G. Lipschultz
_____
George R. Wood  (SBN: 0166017)
*Admission Pending*
Noah G. Lipschultz
**LITTLER MENDELSON, P.C.**
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone: 612.630.1000
Facsimile:  612.630.9626

**ATTORNEYS FOR PLAINTIFF THOMAS
& BETTS POWER SOLUTIONS, LLC.**

Firmwide:95059335.1 052857.1000