UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| THOMAS & BETTS POWER SOLUTIONS, LLC d/b/a JT PACKARD<br><br>Plaintiff,<br><br>vs.<br><br>S.R. BRAY L.L.C. d/b/a POWERPLUS!, James NOLDEN, Sandy SCHIELE, Chris BLODGETT, Jim UHALT, Scott BOWMAN, Patricia EPSTEIN, Michele MARTIN, Shane WOLFRAM, Jennifer WINGERT, Sarah SULLIVAN, Kristi RUE, Samantha MOYES and John ROIDT,<br><br>Defendants. | Court File No. 10-cv-213.<br><br><br><br><br>**STATEMENT OF RECORD FACTS AND THOSE FACTS WHICH PLAINTIFF INTENDS TO PROVIDE AT EVIDENTIARY HEARING IN SUPPORT OF ITS REQUEST FOR INJUNCTIVE RELIEF** |

Plaintiff Thomas & Betts Power Solutions, L.L.C. d/b/a JT Packard ("JT Packard"), pursuant to Federal Rule of Civil Procedure 65 and this Court's Local Rules, submits the following Statement of Record Facts and those Facts Plaintiff Intends to Prove at Evidentiary Hearing, if necessary, in support of its Motion for Injunctive Relief against defendants S.R. BRAY CORP D/B/A POWERPLUS!, James NOLDEN, Sandy SCHIELE, Chris BLODGETT, James UHALT, Scott BOWMAN, Patricia EPSTEIN, Michele MARTIN, Shane WOLFRAM, Jennifer WINGERT, Sarah SULLIVAN, Kristi RUE, Samantha MOYES and John ROIDT ("Individual Defendants")

**I.     PARTIES**

1.      Thomas & Betts Power Solutions, L.L.C., ("TBPS") is a Delaware limited liability company with its principal place of business at 5900 Eastport Blvd, Building V, Richmond, Virginia 23231. Declaration of Thomas Ward ("Ward Decl.") at ¶ 2. In

addition to other lines of business, TBPS does business as JT Packard at 275 Investment Circle, Verona, Wisconsin 53593. Id. TBPS is a large independent provider of critical power services to customers throughout the country. See Ward Decl. at ¶ 2; Declaration of Chris Washburn ("Washburn Decl.") at ¶ 2. JT Packard specializes in the provision of uninterruptible power services to a variety of commercial enterprises throughout the country. See Ward Decl. at ¶ 2; Washburn Decl. at ¶ 2. JT Packard's primary revenue stems from contracts to provide uninterruptible power service equipment, batteries, generators, and technical services to its customers. Washburn Decl. at ¶ 2.

2. TBPS is, and at all times mentioned was, authorized to do business in Wisconsin. Ward Decl. ¶ 2.

3. On January 26, 2010 TBPS purchased substantially all of the operating assets of JT Packard & Associates, Inc. Ward Decl. at ¶ 3.

4. S.R. Bray L.L.C. is a Nevada limited liability company doing business as POWERPLUS! and whose principal place of business is located at 1210 N. Red Gum Street, in the City of Anaheim, California 92806. Ward Decl. at ¶ 3. POWERPLUS! conducts business within the State of Wisconsin. Id. POWERPLUS! is engaged in the business of providing temporary power solutions, including the provision of generators and power poles, and utility consulting design and installation, to a wide variety of market segments including the utility, construction and event industries. POWERPLUS! is a direct competitor of Plaintiff in the power services industry. Id.

5. NOLDEN is a resident of Wisconsin, residing at 2947 Leadville Pass, Blue Mounds, WI 53517. Ward Decl. at ¶ 9. NOLDEN was employed by JT Packard & Associates from approximately March 6, 2006 until January 26, 2010. Id. On March 6,

2006, JT Packard hired NOLDEN as Vice President of Equipment Sales and Business Development. NOLDEN worked in JT Packard's Verona office in that capacity until his employment ended on January 26, 2010. Id. During his employment, NOLDEN's job duties as included, inter alia: overall responsibility for equipment sales at JT Packard, including the supervision of four other Business Development Executives, soliciting and developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard. NOLDEN directly supervised the sales force and reported directly to Steven R. Bray, the former President of JT Packard. Id.

    6.    SCHIELE is a resident of Ohio, residing at 2830 Barharbor Ct., Lewis Center, OH, 43035. Ward Decl. at ¶ 10. SCHIELE reported in to JT Packard's Verona, Wisconsin location from approximately September 2, 2008 through March 24, 2010. Id. On or about September 2, 2008, JT Packard hired SCHIELE as a Business Development Executive. Id. SCHIELE worked in JT Packard's Verona office in that capacity until her voluntary resignation on March 24, 2010. Id. During her employment, SCHIELE's job duties as Business Development Executive included general sales support, soliciting and developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard. Id.

    7.    BLODGETT is a resident of Wisconsin, residing at 16507 Oak Hill Trail, Muskego, WI 43150. Ward Decl. at ¶ 11. BLODGETT was employed by JT Packard from approximately August 15, 2005 to April 16, 2010. Id. On or about August 15, 2005,

3

JT Packard hired BLODGETT for the position of Sales Application Engineer. Id. BLODGETT worked in JT Packard's Verona office until his voluntary resignation on April 16, 2010. Id. During his employment, BLODGETT's job duties as Sales Application Engineer included, inter alia: supporting client relationship with respect to technical expertise in various IT areas relating to the sales function, soliciting and developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard. Id.

8.   UHALT is a resident of Wisconsin, residing at 442 Ineichen Drive, Verona, WI 53593. Ward Decl. at ¶ 12. UHALT was employed by JT Packard from approximately July 23, 2008 through April 5, 2010. Id. On or about June 23, 2008, JT Packard hired UHALT for the position of Business Development Executive. Id. UHALT worked in JT Packard's Verona office until his voluntary resignation on April 5, 2010. Id. During his employment, UHALT's job duties as Business Development Executive included, inter alia:  soliciting and developing new client relationships; maintaining business relationships with existing clients (including property management firm clients, which are among Plaintiff's largest clients); developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard. Id.

9.   BOWMAN is a resident of Indiana, residing at 15068 Windsor Lane, Noblesville, IN 46060. Ward Decl. at ¶ 13. BOWMAN was employed in JT Packard's Verona, Wisconsin location from approximately July 25, 2006 through January 26, 2010. Id. On or about July 25, 2005, JT Packard hired BOWMAN as its Area Service Director.

4

Id. BOWMAN worked remotely out of JT Packard's Verona office until his employment ended on January 26, 2010. Id. During his employment, BOWMAN's job duties as Area Service Director included, inter alia: the management of JT Packard's Regional Managers and field engineers (i.e, those employees who performing service and maintenance calls at customer sites) and the maintenance of relationship with the end-user clients. Id.

10.   EPSTEIN is a resident of Wisconsin, residing at 3463 Whytecliff Way, Sun Prairie, WI 53590. Ward Decl. at ¶ 14. EPSTEIN was employed by JT Packard from approximately September 5, 2006 through January 26, 2010. Id. On or about September 5, 2006, JT Packard hired EPSTEIN as its Director of Field Service Operations. Id. EPSTEIN worked in JT Packard's Verona office until her employment ended on January 26, 2010. Id. During her employment, EPSTEIN's job duties as Director of Field Service included, inter alia: supervision of field service managers and field service engineers and serving as a customer liaison with respect to the services provided to customers by the field service engineers. Id.

11.   MARTIN is a resident of Wisconsin, residing at 1804 Fjord Pass, Mount Horeb, 53572. Ward Decl. at ¶ 15.  MARTIN was employed by JT Packard from approximately October 22, 2007 through February 24, 2010. Id.  On or about October 22, 2007, JT Packard hired MARTIN as its Customer Service Supervisor. Id. MARTIN worked in JT Packard's Verona office until her voluntary resignation on February 24, 2010. Id. During her employment, MARTIN 's job duties as Customer Service Supervisor included, inter alia: supervision of 5-6 customer service representatives, and management of the emergency call center. Id.

12. WOLFRAM is a resident of Wisconsin, residing at 5206 Preservation Place, Sun Prairie, WI 53590. Ward Decl. at ¶ 16. WOLFRAM was employed by JT Packard from approximately October 20, 2008 through March 17, 2010. Id. On or about October 20, 2008, JT Packard hired WOLFRAM as its Director of Equipment Sales. Id. WOLFRAM worked in JT Packard's Verona office until his voluntary resignation on March 17, 2010. Id. During his employment, WOLFRAM's job duties as Director of Equipment Sales included, inter alia: responsibility for power equipment sales, soliciting and developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard. Id.

13. WINGERT is a resident of Wisconsin, residing at 7328 Santa Fe Trail, Madison, WI 53719. Ward Decl. at ¶ 17. WINGERT was employed by JT Packard from approximately August 29, 2005 through March 23, 2010. Id. On or about August 29, 2005, JT Packard hired WINGERT as its Equipment Sales Coordinator. Id. WINGERT worked in JT Packard's Verona office until her voluntary resignation on March 23, 2010. Id. During her employment, WINGERT's job duties as Equipment Sales Coordinator included, inter alia: general sales support, soliciting and developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard. Id.

14. SULLIVAN is a resident of Wisconsin, residing at 239 Kelvington Drive, Sun Prairie, WI 53590. Ward Decl. at ¶ 18. SULLIVAN was employed by JT Packard from approximately November 2, 2009 through March 24, 2010. Id. On or about

November 2, 2009, JT Packard hired SULLIVAN for the position of Marketing Manager. SULLIVAN worked in JT Packard's Verona office until her voluntary resignation on March 24, 2010. Id. During her employment, SULLIVAN's job duties as Marketing Manager included, inter alia: advertising and marketing on behalf of JT Packard at trade shows and on the internet, creation of marketing materials, and the generation of customer business. Id.

15. RUE is a resident of Wisconsin, residing at 4435 Pikes Peak Road, Ridegeway, WI 53582. Ward Decl. at ¶ 19. RUE was employed by JT Packard from approximately September 5, 2007 through March 30, 2010. Id. On or about September 5, 2007, JT Packard hired RUE as the Team Lead of Subcontractor Support. RUE worked in JT Packard's Verona office until her voluntary resignation on March 30, 2010. Id. During her employment, RUE's job duties as Team Lead of Subcontractor Support included, inter alia: coordination of subcontractors to fulfill primary service contracts with customers, including the selection, qualification, and bidding of subcontractors, and the negotiation of subcontractor business relationships. Id.

16. MOYES is a resident of Wisconsin, residing at 119 Faircrest Court, Verona, WI 53593. Ward Decl. at ¶ 20. MOYES was employed by JT Packard from approximately April 4, 2005 through April 1, 2010. Id. On or about April 4, 2005, JT Packard hired MOYES as the Business Development Coordinator. Id. MOYES worked in JT Packard's Verona office until her voluntary resignation on April 1, 2010. Id. During her employment, MOYES's job duties as Business Development Coordinator included, inter alia: developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contacts;

7

and creating goodwill through personal contacts and business relationships for JT Packard. Id.

17. ROIDT is a resident of Wisconsin, residing at 2979 Door Creek Road, Stoughton, WI 53589. Ward Decl. at ¶ 21. ROIDT was employed by JT Packard from approximately November 7, 2005 through April 6, 2010. Id. On or about November 7, 2005, JT Packard hired ROIDT as an Equipment Sales Consultant. Id. ROIDT worked in JT Packard's Verona office until his voluntary resignation on April 6, 2010. Id. During his employment, ROIDT's job duties as Equipment Sales Consultant included, inter alia: general sales support, soliciting and developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contacts; and creating goodwill through personal contacts and business relationships for JT Packard. Id.

### II. Defendants' Employment With JT Packard, and Access to JT Packard's Confidential and Trade Secret Information

18. JT Packard has invested and continues to invest considerable resources to develop information, methods, and techniques to provide the services and products described above to customers throughout the country, and to price such services and equipment competitively. Ward Decl. at ¶ 4. All of that information is valuable, confidential, and proprietary to JT Packard, and is not generally known in the public domain. Id.

19. JT Packard employs sales employees and sales supports employees, including Business Development Executives, Sales Consultants, Business Development and Equipment Sales Coordinators, Directors for Area and Field Services, Supervisors in the area of Customer Service, Sales Application Engineers, Sales Application Engineers,

8

and Marketing Managers and Directors of Equipment Sales, whose job duties involve developing new clients for the company. Ward Decl. at ¶ 5. These individuals are privy to and become intimately knowledgeable about, among other things, JT Packard's billing rates, unique pricing matrices that JT Packard created for itself, bid and quote procedures, the identity of our clients, including their unique business needs, their preferences and decision makers for third-party uninterruptible power services, their power services equipment inventory and service needs and history, subcontracting relationships to provide services relating to our service agreements. Id. Development of this proprietary information requires a significant investment of time and resources by JT Packard. Id. It also has significant economic value and would be especially valuable to our competitors in the power services industry. Id. Washburn Decl. ¶ 3.

20. In an effort to maintain the confidentiality of its proprietary information, JT PACKARD requires that the individuals it employs above sign restrictive covenants, non-solicitation and non-disclosure agreements as a condition of employment, and have password login to confidential databases/software. Ward Decl. at ¶ 6. It also limits access to that information to only those employees with a business need to know. Id.

21. Prior to their employment with JT Packard, James Nolden, Sandy Schiele, Chris Blodgett, Scott Bowman, Patricia Epstein, Michele Martin, Shane Wolfram, Jennifer Wingert, Sara Sullivan, Kristi Rue, Samantha Moyes, and John Roidt ("Individual Defendants") had no knowledge of JT Packard's confidential information or trade secrets, i.e., the identity of JT Packard' clients, its contacts for those clients, pricing for various clients, its clients' power equipment needs and inventory, JT Packard's field service training and processes. Ward Decl. at ¶ 7; Washburn Decl. ¶ 3. Many of these

individuals did not even work in the industry prior to their employment with JT Packard. Id.

### III. Individual Defendants' Agreements With JT Packard

22. As a condition to, and in consideration of the Individual Defendants being hired by JT Packard, all except WOLFRAM, entered into: (1) a non-solicitation agreement; (2) a non-disclosure agreement; and (3) a non-competition agreement. Ward Decl. at ¶ 6. Those agreements provided that each "shall inure to the benefit of any successors or assigns of Employer and shall be enforceable against and/or binding upon any successors, employees, partners, corporations, proprietorships, partnerships, joint ventures, legatees, heirs, and assigns of Employee." See Complt. Exs. A-L; Ward Decl. at ¶ 6, 22.

23. All of the agreements described herein contain a choice-of-law provision designating Wisconsin law and venue in the State or Federal courts of Wisconsin and each one of them contains a severability clause providing that the invalidity of one portion of the agreement shall not affect enforceability of other portions thereof. See Complt. Exs. A-L, Ward Decl. ¶¶ 6, 22.

24. In addition, all of the agreements described herein were supported by adequate consideration in that they were signed in connection with the Individual Defendants' hiring by, and receiving training from, JT Packard, plus in certain cases (Rue, Schiele, Sullivan, Uhalt, Blodgett, Wingert, Martin, Moyes) additional severance pay if the employee's termination was other than "for cause." See See Complt. Exs. A-L, Ward Decl. ¶¶ 6, 22.

   **A.   Non-Solicitation Agreements**

25. NOLDEN, BLODGETT, UHALT, BOWMAN, EPSTEIN, MARTIN, WINGERT, MOYES and ROIDT's Non-Solicitation Agreements specifically provide, inter alia, as follows:

> For a period of one (1) year following termination (voluntary or involuntary) of Employee's employment with Employer, Employee covenants, promises and agrees that he/she will not solicit on behalf of or for the benefit of any person or entity in competition with Employer, including the Employee, any customer of Employer with which Employee had contact during one (1) year preceding the date of Employee's termination. For purposes of this Agreement, customer means: (a) any person or entity that purchased any goods or services from Employer within one year prior to the termination of Employee's employment, and (b) any potential customer that Employee ad solicited on behalf of Employer within one (1) year prior to termination of Employee's employment.

See Complt. Exs. A, B, C, D, E, F, J and L.

26. SCHIELE, RUE, and SULLIVAN's Non-Solicitation Agreements specifically provide, inter alia, as follows:

> For eighteen (18) months following the end of Employee's employment with the Company, for whatever reason, Employee agrees not to directly or indirectly attempt to sell to any Restricted Customer any products, goods, or services of the type or substantially similar to the type sold or provided by the Employee on behalf of the Company during the twelve (12) months preceding the end, for whatever reason, of Employee's employment with the Company.
>
> During the term of Employees employment with the Company and for twelve (12) months thereafter, Employee shall not directly or indirectly encourage any Company employee to terminate such employee's employment with the Company or solicit such an individual for employment outside the Company which would end or diminish that employee's services to the Company.

See Complt. Exs. G, H and I.

11

27. Defendants UHALT, BLODGETT, WINGERT, MARTIN, AND MOYES, in addition to executing the agreement described in paragraph 47, also executed agreements containing the language set forth above pertaining to SCHIELE, RUE, and SULLIVAN. See Complt. Exs. A, D, J, K, and L.

28. The SCHIELE, RUE, and SULLIVAN Agreements (which Uhalt, Blodgett, Wingert, Martin, and Moyes also executed) further provide:

> Duty of Loyalty: During the term of the Employee's employment with the Company, the Employee will not: (i) directly or indirectly compete with the Company; (ii) directly or indirectly divert or attempt to divert Customers' or Potential Customers' business from the Company anywhere the Company does or is taking steps to do business; (iii) prepare to directly or indirectly compete against the Company or prepare to divert or attempt to divert Customers' or Potential Customers' business away from the Company.

See Complt. Exs. G, H and I.

**2.  Non-Disclosure Agreements**

29. NOLDEN, BLODGETT, UHALT, BOWMAN, EPSTEIN, MARTIN, WINGERT, MOYES and ROIDT's non-disclosure agreements specifically provide, inter alia, as follows:

> Employee agrees that, for a period of one (1) year following termination(voluntary or involuntary) of his/her employment with Employer, Employee shall not use, reveal or disclose Employer's Proprietary or Confidential Information, and shall not induce or assist others in obtaining, using, or revealing Employer's Proprietary or Confidential Information, in any manner which is or may reasonably be construed to be to the detriment of Employer. Without limitation to the provisions... above, Employee expressly agrees that, for a period of one (1) year following termination (voluntary or involuntary) of his/her employment with Employer, Employee shall not use Employer's Proprietary Information in the form of

12

> customer identities, contacts, preferences, needs, desires, purchasing histories, or other customer information, for the purpose of soliciting such customers in competition with Employer.  For purposes of this sub-paragraph, customer means: (a) any person or entity that purchases any goods or services from Employer within one year prior to the termination of Employee's employment, and (b) any potential customer of Employer, either identified as such by Employer during Employee's employment or actually solicited by Employer,  within one (1) year prior to termination of Employee's employment, where Employee acquired knowledge of the potential customer during the course of his/her employment with Employer.

See Complt. Exs. A, B, C, D, E, F, J, K and L.

30. Defendant NOLDEN, BLODGETT, UHALT, BOWMAN, EPSTEIN, MARTIN, WINGERT, MOYES and ROIDT's non-disclosure agreements define "confidential" and "proprietary" information in part to included "any data or information relating to either Employer's business, products, services or customers that is material to Employer and not generally known by the public or disclosed in the public sales literature of Employer."  Such information is also defined to include: information relating to business processes and methods, computer hardware and software programs, inventions and discoveries, sales figures and projections, marketing and advertising strategies, methodologies and research, financial information, internal policies and procedures; training practices and methods, and customer information (including information pertaining to the identity of Employer customers, their special demands, preferences and tendencies and their current and anticipated requirements for Employer's products and services).  See Complt. Exs. A, B, C, D, E, F, J, K and L.

31. Defendant SCHIELE, SULLIVAN, and RUE's non-disclosure agreements provide that, for a period of eighteen (18) months following the end of their employment,

they shall not "directly or indirectly use or disclose Confidential Information.." The agreements define "Confidential Information" as "all non-Trade Secret information of, about or related to the Company by its customers that is not known generally to the public or the Company's competitors" including: "(i) information about products under development, research, development or business plans, financial information, Customer lists, distribution lists, vendor lists, information about orders from and transactions with Customers, distributors or vendors, sales and marketing strategies and plans, pricing strategies, information relating sources of material and production costs, personnel information, and business records; (ii) information which us marked for otherwise designated as confidential or proprietary by the Company; and (iii) confidential information of customers.  See Complt. Exs. G, H and I.

> IV.   **Individual Defendants' Breach Their Agreements, and PowerPlus! Tortiously Interferes with the Agreements and Customer Relationships.**

32.   Nolden accepted employment with PowerPlus! and began working on its behalf before the end of his employment with JT Packard. Ward Decl. at ¶ 26.

33.   During a meeting held on the last day of his employment with JT Packard, NOLDEN advised JT Packard's Human Resources manager that he was going to "destroy" JT Packard.  NOLDEN reiterated this comment several times during the interview. Ward Decl. at ¶ 24.

34.   NOLDEN misappropriated confidential information from JT Packard prior to the end of his employment, soliticed other JT Packard employees to leave JT Packard to go to work for POWERPLUS! and solicited clients from JT Packard while still employed by it. Ward Decl. at ¶ 25; Washburn Decl. ¶ 4.

35. Both before and immediately following the end of his employment with JT Packard, NOLDEN engaged in the following actions on behalf of POWERPLUS!:

a. solicitation of JT Packard customers with whom he had contact during the last year of his employment with JT Packard and whose relationships with JT Packard preceded his employment with JT Packard.

b. solicitation of then-current JT Packard employees to come to work for POWERPLUS!

c. solicitation and gathering of confidential business information of JT Packard through employees of JT Packard.

d. tortious interference with JT Packard customer relationships.

e. using JT Packard's confidential business information to solicit current JT Packard employees to solicit customer business on behalf of POWERPLUS!

Ward Decl. at ¶ 26; Washburn Decl. ¶ 4-5.

36. Since their respective departures from JT Packard and for the benefit of POWERPLUS!, SCHIELE, UHALT and NOLDEN have used their intimate, detailed knowledge of JT Packard's confidential client information to solicit current clients of JT Packard including Via West, Charter, McKinstry, FedEx, Verizon, Agilent, United Healthgroup, and Oracle. Washburn Decl. at ¶ 5.

37. On March 8, 2010, immediately prior to announcing her resignation, SCHIELE forwarded nearly 100 e-mails from her JT Packard e-mail account to her personal e-mail account. Washburn Decl. at ¶ 6. Those emails contained at least the following categories of information:

- Contact information, telephone numbers, names, and addresses of JT Packard customers;

- JT Packard marketing materials;

- JT Packard customer contract and bid information;

- Procedures for maintenance of JT Packard products; and

- Account assignment lists, including customer names, responsible JT Packard employee, customer account value and contract value. Washburn Decl. at ¶ 6.

38. SCHIELE went to work for POWERPLUS! within two weeks after forwarding the emails outlined above. Washburn Decl. at ¶ 7. On information and belief, NOLDEN, on behalf of POWERPLUS!, instructed SCHIELE to bring that information with her to POWERPLUS!. Id. SCHIELE had no legitimate business reason as far as her work at JT Packard was concerned to forward such information to her personal email account. Id. In addition, prior to the end of her employment, SCHIELE participated in an interview for the purpose of recruiting a candidate for employment for POWERPLUS! Id.

39. Contrary to her non-compete and non-disclosure agreements, SCHIELE has failed to return her company-issued laptop computer. Ward Decl. at ¶ 27.

40. Prior to their resignations from JT Packard, POWERPLUS! established e-mail accounts for ROIDT and BLODGETT, as well as cell phones, which both utilized before their employment with JT Packard ended, for the benefit of POWERPLUS! Washburn Decl. at ¶ 8.

41. During his employment with JT Packard, BLODGETT communicated with NOLDEN and other key personnel of POWERPLUS! for the purpose of sharing

16

confidential JT Packard information and interfering with JT Packard's business expectancy and contractual relationships. See Washburn Decl. at ¶ 9-10.

42. During his employment with JT Packard, BLODGETT attempted to destroy evidence of his breach of non-solicitation and non-disclosure agreements by deleting communications from his computer and attempting to have his computer "reset" to destroy evidence of his wrongful conduct. Ward Decl. at ¶ 28.

43. In early April, 2010, JT Packard received a call from a client, Flight Safety International, who indicated, without forewarning, that it was moving its contract to another provider. Washburn Decl. at ¶ 11. Several days later, JT Packard received an e-mail confirming that the client planned to move its business to POWERPLUS!. Id. This client was one serviced by BLODGETT, though it was not BLODGETT's client originally. Id. BLODGETT, it is believed, solicited the client to cease doing business with JT Packard and to commence doing business with POWERPLUS!. Id. When an employee of JT Packard went to locate to documentation relating to the client, including pricing information, such documentation was missing. Id. On information and belief, in 2009 alone, the value of the business of this client for the period through and including October 30, 2009 was over $350,000. Id.

44. On April 16, 2010, BLODGETT was scheduled to have an exit interview with JT Packard. BLODGETT did not appear, nor has he returned his company-owner laptop computer. Ward Decl. at ¶ 29.

45. Prior to their resignations and during their employment with JT Packard, UHALT and NOLDEN engaged in a series of communications regarding the solicitation of JT Packard customers on behalf of POWERPLUS!, based on confidential information

each had learned as a result of their employment with JT Packard. Washburn Decl. at ¶ 9. JT Packard became aware of such communications because NOLDEN e-mailed UHALT and BLODGETT regarding the solicitation of JT Packard clients on behalf of POWERPLUS! while UHALT and BLODGETT were still employed by JT Packard. Id. NOLDEN indicated that the three of them would plan a trip to Denver the week of April 19, 2010 to accomplish such goals. Id.  In the e-mail, NOLDEN referred to previous efforts by he and SCHIELE to solicit JT Packard business. Id.

46.    Upon information and belief, NOLDEN, SCHIELE, BLODGETT, MARTIN, MOYES and UHALT have used and disclosed JT Packard' confidential proprietary information and trade secrets obtained through their employment with JT Packard. Ward Decl. at ¶ 30.

47.    Specifically, MARTIN forwarded confidential JT Packard information relating to an employee training program, developed by JT Packard, to her home e-mail account from her JT Packard e-mail account shortly before her resignation from JT Packard. Ward Decl. at ¶ 31. MARTIN had no legitimate business reason with respect to her JT Packard employment to forward such information to her personal e-mail account. Id. It is believed MARTIN has shared such information with POWERPLUS! Id.

48.    MOYES and WINGERT provided specific client price bidding information they received as a result of their employment with JT Packard to POWERPLUS!. Ward Decl. at ¶ 32.

49.    All individually-named defendants are unfairly competing with Plaintiff and soliciting its clients in the geographic area encompassed by the non-competition and

non-solicitation provisions of their respective Employment Agreements, to the detriment and harm of Plaintiff. Ward Decl. at ¶ 34.

50.   PowerPlus! had knowledge of Individual Defendants' Agreements with Plaintiff and encouraged them to breach their agreements by using and disclosing confidential information obtained at JT Packard in order to solicit JT Packard's customers.

51.   In particular, POWERPLUS! encouraged and directed former JT Packard employees to recruit other JT Packard employees to come to work for POWERPLUS while both were still employed by JT Packard for the specific purpose of injuring Plaintiff.

52.   In addition, POWERPLUS! encouraged, directed, aided, abetted and approved the individually-named defendants' actions of:

a.   competing with JT Packard while still employed by it, and afterwards, in breach of their non-competition agreements;

b.   soliciting clients with whom they had contact during the last year of their employment with JT Packard, in breach of their non-solicitation agreements;

c.   misappropriating confidential and trade secret information; and

d.   tortiously interfering with Plaintiff's customer relationships and employment relationships.

53.   Within the past week, several other significant current customers have advised Plaintiff that Nolden and other former JT Packard employees have solicited their business on behalf of PowerPlus! Washburn Decl. ¶ 13.

54. Plaintiff has suffered and will continue to suffer harm as a result of defendants' actions; the marketplace in which Plaintiff and PowerPlus! compete is highly specialized, and there are very few entities competing for the same, fixed client base to provide the same or similar goods and services.  Washburn Decl. ¶ 14.

Dated this 19th day of April, 2010.

/s Noah G. Lipschultz
George R. Wood  (SBN: 0166017)
Noah G. Lipschultz
**LITTLER MENDELSON, P.C.**
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone: 612.630.1000
Facsimile:  612.630.9626

**ATTORNEYS FOR PLAINTIFF THOMAS & BETTS POWER SERVICES, L.L.C.**

Firmwide:95060306.1 052857.1000