IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

THOMAS AND BETTS POWER
SOLUTIONS, LLC, d/b/a JT PACKARD
& ASSOCIATES,

                               Plaintiff,                        OPINION AND ORDER

    v.

                                                          10-cv-213-wmc

S. R. BRAY LLC, d/b/a POWERPLUS,
SANDY SCHIELE, and BEN WAIT,

                            Defendants.

---

Defendant S.R. Bray LLC, d/b/a PowerPlus moves to dismiss plaintiff Thomas and Betts Power Solutions, LLC, d/b/a/ JT Packard & Associate's complaint, which alleges various state law claims. Defendant contends plaintiff's pleading either fails (1) to meet the requirement of Rule 8 of the Federal Rules of Civil Procedure, especially in light of the pleadings requirements in *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009); or (2) to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6). The court will deny defendant's motion with respect to plaintiff's claims for theft of trade secrets pursuant to Wis. Stat. § 134.90 and common law misappropriation of confidential information claims. The court agrees with defendant that plaintiff's conversion and breach of contract claims fail as a matter of law and, therefore, will dismiss those claims. As for plaintiff's tortious interference with contract claim, the court will dismiss it for failure to plead enough facts to place defendant on notice as to the substance of the claim.

Also before the court, and raised in the same motion, is defendant PowerPlus's motion to strike certain portions of the Third Amended Complaint pursuant to Rule 12(f) of the Federal Rules of Civil Procedure on the basis that these allegations constitute "immaterial and impertinent matter."[1]  (Def.'s Mot. to Dismiss and Strike (dkt. #82) 1.) Generally speaking, motions to strike portions of pleadings are disfavored as they consume scarce judicial resources and may be used for dilatory purposes. *See Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 727 (7th Cir. 2006).  For this reason, the court only reviews defendant's motion to the extent a failure to strike might unfairly prejudice defendant,  *See Eagle Cove Camp & Conference Center, Inc. v. Town of Woodboro*, No. 10-cv-118-wmc, slip op. at 6 (W.D. Wis. Mar. 24, 2011).  Here, defendant does not claim -- nor can it claim -- that it was prejudiced by the alleged "immaterial and impertinent" pleadings.  Accordingly, PowerPlus's motion to strike (dkt. #82) will be denied.

---

[1] The parties to this action, as well as other entities materially involved in the claims have similar names.  The court will attempt to limit confusion by referring to these companies by the distinct elements of their respective names.  By means of introduction, the plaintiff is Thomas and Betts Power Solutions, LLC d/b/a JT Packard & Associates ("Power Solutions").  Power Solutions' sole member is Thomas & Betts Corporation. Defendant is S.R. Bray LLC, d/b/a PowerPlus ("PowerPlus").  The two other entities of particular importance to plaintiffs' allegations are S.R. Bray Corporation ("S.R. Bray"), which is a different entity than defendant PowerPlus, and JT Packard & Associates, Inc. ("J.T. Packard"), which is a different entity than plaintiff Power Solutions.  S.R. Bray used to own J.T. Packard, and neither of these entities is currently in existence.

## ALLEGATIONS OF FACT[2]

### A.      The Parties

Power Solutions is a competitor of PowerPlus.  Both companies are in the business of providing critical power services, including uninterruptible power supply services and equipment, to customers throughout the country, including in Wisconsin.

The individual defendants Sandy Schiele and Ben Wait are former employees of Power Solutions.   During her employment, Schiele was the Business Development Executive, and her duties included general sales support; soliciting and developing new client relationships; maintaining business relationships with existing clients; developing and maintaining lists of clients, potential clients and contracts; and creating goodwill through personal contacts and business relationships for Power Solutions.   Schiele resigned on March 24, 2010, and started work for PowerPlus by the end of March 2010.

Wait was employed as Power Solutions' Southeast Regional Manager until his resignation on April 19, 2010.  Wait's job duties included the supervision and direction of field service engineers; assignment of field engineers to service customer equipment; and maintenance of customer relationships with respect to field engineer service-related issues.  After his resignation, Wait allegedly confirmed that he was "joining forces" with PowerPlus (3d Am. Compl. (dkt. #78) ¶ 34), but it is not clear from the allegations whether he was subsequently employed by PowerPlus.

---

[2] The court accepts as true all well-pleaded facts and allegations in the complaint, drawing all reasonable inferences in favor of the plaintiffs.  *London v. RBS Citizens, N.A.*, 600 F.3d 742, 745 (7th Cir. 2010).

B.     **Background Sales and Agreements**

On June 23, 2009, S.R. Bray consummated a general assignment for the benefit of creditors with Credit Managers Association of California ("CMA").  Through the general assignment, S.R. Bray transferred all of its assets including, but not limited to, its interests in J.T. Packard and all of the assets of J.T. Packard to CMA.  That same day, CMA transferred a portion of S.R. Bray's assets to the newly-created entity PowerPlus. (Declaration of Steven R. Bray ("Bray Decl."), Ex. C (dkt. ##85-1 to 85-3.)  The transfer to PowerPlus included all of the construction services and generator rental assets of S.R. Bray, but specifically excluded J.T. Packard, the business conducted by J.T. Packard and all of the assets of S.R. Bray used predominantly or exclusively in J.T. Packard's business.

On July 13, 2009, PowerPlus entered into an Independent Contractor Agreement ("ICA") with J.T. Packard, by which PowerPlus was to provide generator services to J.T. Packard's customers. (Declaration of Keith Bjelajac ("Bjelajac Decl."), Ex. A (dkt. #84-7).)[3]  The ICA contains several key provisions.  First, the ICA contains a non-compete provision, which applies during the term of the ICA (the initial term was one year from

---

[3] Power Solutions refers to the ICA and other documents in its complaint, but does not attach them.  In support of its motion to dismiss, PowerPlus has submitted the ICA, and two other documents -- the Asset Purchase Agreement ("APA") by which Power Solutions purchased J.T. Packard's assets and the Asset Purchase Agreement between S.R. Bray and CMA.  The court may consider documents attached to a motion to dismiss which are "referred to in the plaintiff's complaint and are central to plaintiff's claim."  *E.E.O.C. v. Concentra Health Services, Inc.*, 496 F.3d 773, 778 (7th Cir. 2007).  The APA and ICA are expressly referenced.  The Asset Purchase Agreement between PowerPlus and CMA is not expressly referenced, but the Third Amended Complaint does allege that CMA transferred a portion of S.R. Bray's assets to PowerPlus, making it reasonable to infer that the transfer happened by means of this Asset Purchase Agreement.  Accordingly, the court will consider all of these documents in deciding the motion to dismiss.

the commencement of the agreement) and for a period of one year after its expiration or

termination, which provides:

> Contractor shall not directly or indirectly, on Contractor's
> own behalf or on behalf of any third party, solicit, call, entice,
> induce or in any other way encourage any Customer to: (i)
> terminate or diminish its relationship or business activities
> with Company; (ii) seek to persuade any Customer of
> Company to conduct any business or activity with a third
> party that such Customer is contemplating conducting with
> Company; or (iii) otherwise interfere with Company's
> relationship with any of its Customers.

(Bjelajac Decl., Ex. A (dkt. #84-7) ¶ 13; *see also* 3d Am. Compl. (dkt. #78) ¶ 23.)  The

"Contractor" is PowerPlus, and the "Company" is J.T. Packard.  (Bjelajac Decl., Ex. A

(dkt. #84-7) p.2.)  (This designation is material as will be discussed later in the opinion.)

Second, the ICA also contains a non-solicitation provision which applies to the

same period of time as to the non-compete provision, and provides:

> neither party will directly or indirectly, solicit employment by
> itself (or any of its affiliates) any employee of the other party
> (or any of its affiliates), without such party's prior written
> consent.

(*Id.* at ¶ 14; *see also* 3d Am. Compl. (dkt. #78) ¶ 26.)

Third, the ICA contains a "Confidential Information" provision.  "Confidential

Information" is defined in the ICA, as including, but not limited to

> customer lists and related customer information, marketing
> plans, business plans, training techniques and manuals,
> strategies, forecasts, unpublished financial information,
> budgets, projections, inventions, discoveries, improvement
> and related materials.

(Bjelajac Decl., Ex. A (dkt. #84-7) ¶ 12; *see also* 3d Am. Compl. (dkt. #78) ¶ 25.)  This

provision covers the term of the ICA, and requires both PowerPlus and J.T. Packard to

5

use such information "solely in connection with their performance pursuant to the terms of the Agreement and for no other purpose." (*Id.*)

On July 22, 2009 S.R. Bray's creditors filed an involuntary bankruptcy petition against S.R. Bray.  In connection with the bankruptcy proceeding, J.T. Packard was placed in a receivership through a proceeding which commenced on November 24, 2009. As part of the receivership proceeding, the assets of J.T. Packard were sold to Power Solutions via auction.  Power Solutions completed the purchase of J.T. Packard's assets on January 26, 2010 pursuant to a written asset purchase agreement ("APA"). (Declaration of Keith Bjelajac ("Bjelajac Decl."), Ex. B (dkt. ##84-1 to 84-6).) Specifically, Power Solutions purchased J.T. Packard's "Intellectual Property Rights" which, as defined by the APA, included, but were not limited to

> all trade secrets and confidential information (including all ideas, concepts, research and development, know-how, composition information and embodiments, manufacturing and production processes, techniques and business data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals).

(3d Am. Compl. (dkt. #78) ¶ 17.)  These transferred rights also included "all copies and tangible embodiments of the foregoing [categories] in whatever form or medium." (*Id.*)

## C.   Power Solutions' Allegations as to Defendants

### 1.   PowerPlus's Acquisition of J.T. Packard's Confidential Information

Power Solutions alleges that S.R. Bray "copied and/or retained certain of J.T. Packard's confidential information, trade secrets and other business information" --

which Power Solutions refers to as the "Retained Information" -- "that had been transferred by S.R. Bray to [CMA] and [CMA] to the J.T. Packard receivership estate and by the J.T. Packard receivership estate to [Power Solutions]." (3d Am. Compl. (dkt. #78) ¶ 18.)  Power Solutions also alleges that:  (1) PowerPlus acquired the Retained Information from S.R. Bray, CMA, and/or the J.T. Packard receivership estate; (2) it "remains in the possession and control of PowerPlus currently;" and (3) upon information and belief, PowerPlus is "using the Retained Information in its business in competition with and to the detriment of [Power Solutions]." (*Id.* at ¶¶ 19-20.)

### 2.    PowerPlus's Alleged Breach of the ICA

Power Solutions alleges that "[t]he ICA was transferred to [Power Solutions] pursuant to the APA." (3d Am. Compl. (dkt. #78) ¶ 22.)  Power Solutions also alleges that PowerPlus has breached the terms of the ICA by improperly soliciting business from Power Solutions' customers, and by improperly soliciting Power Solutions' employees to work for PowerPlus, listing several people in the complaint, including the two individual defendants. (*Id.* at ¶¶ 27-28.)

### 3.    Defendant Wait's Alleged Misconduct

Power Solutions alleges that at approximately 6:53 a.m. on April 19, 2010 (Wait's last day of employment with Power Solutions), Wait forwarded numerous emails with over 60 attachments from his Power Solutions email account to her personal email account.  These emails included:

- Dozens of Confidential, Proprietary, and trade secret "methods of process" - internal [Power Solutions]-developed procedures for service and repair of client equipment;

- Confidential, Proprietary, and trade secret detailed personnel information regarding [Power Solutions] field service engineers, including, but not limited to, a [Power Solutions]-developed matrix used in connection with providing field service technician support to clients;

- Customer contact lists;

- A variety of other field engineer service processes and procedures that are unique and proprietary to [Power Solutions], and which were developed by it, in some cases specific to an individual client.

(3d Am. Compl. (dkt. #78) ¶ 31.)  That same day, Power Solutions' Human Resources Director Thomas C. Ward sent a "litigation hold" letter to Wait, though Wait refused to acknowledge receipt.  On April 21, 2010, Wait "confirmed that he was 'joining forces' with Power Plus[.]"  (*Id.* at ¶ 34.)

### 4.    **Defendant Schiele's Alleged Misconduct**

Power Solutions alleges that on March 8, 2010, immediately before Schiele announced her resignation, Schiele forwarded almost 100 emails from her Power Solutions email account to her personal email account.  These emails included:

- Contact information, telephone numbers, names and addresses of [Power Solutions] customers;

- [Power Solutions] marketing materials;

- [Power Solutions] customer contract and bid information;

- Procedures for maintenance of [Power Solutions] products; and

- Account assignment lists, including customer names, responsible for Power Solutions employee, customer account value and contract value.

(*Id.* at ¶ 35.)  Power Solutions further alleges that Nolden, a PowerPlus employee and former Power Solutions employee, instructed Schiele to bring this information with her to PowerPlus.  Before her resignation, Schiele also allegedly participated in an interview with another Power Solutions employee for the purpose of recruiting that employee to work for PowerPlus.  Finally, at the time of her departure, Schiele allegedly failed to return her company-issued laptop computer as required by her non-compete and non-disclosure agreements.

Power Solutions alleges that "PowerPlus has obtained possession and control over more of [Power Solutions'] confidential information and trade secrets, specifically through the actions of its employees Wait and Schiele."  (*Id.* at ¶ 39.)

OPINION[4]

In its third amended complaint, Power Solutions alleges the following five causes of action: (I) Theft of Trade Secrets in violation of the Wisconsin Uniform Trade Secrets Act against all defendants; (II) Common Law Misappropriation of Confidential

---

[4] The court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a). Complete diversity exists, and the amount in controversy exceeds $75,000.  Plaintiff Power Solutions' sole member Thomas & Betts Corporation is incorporated in the State of Delaware, and its principal place of business is in Memphis, Tennessee.  Defendant PowerPlus's members are Steven R. Bray and Keith Bjelajac, both of whom are citizens of California.  Defendant Sandy Schiele is a citizen of Ohio.  Defendant Ben Wait is a citizen of Florida.

Information against all defendants; (III) Conversation against all defendants; (IV) Breach of Contract against PowerPlus; (V) Tortious Interference with a Contract against PowerPlus.[5]   Defendants move to dismiss all of the claims for the reasons discussed below.

## I.   Pleading Requirements

Both parties spend significant portions of their briefs on this motion discussing the importance of *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), and subsequent Seventh Circuit cases on Rule 8 of the Federal Rules of Civil Procedure.   Neither party's position is entirely correct.

Defendant's contention that *Twombly* and *Iqbal* "radically altered the legal landscape surrounding motions to dismiss for failure to state a claim" overreaches. (Def.'s Br. (dkt. #83) 11.)   The federal courts still operate "on a notice pleading standard; *Twombly* and its progeny do not change this."   *Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 603 (7th Cir. 2009).   The plaintiff need not provide detailed factual allegations, but must provide "just enough facts to raise [the claim] above the level of mere speculation." *Riley v. Vilsack*, 665 F. Supp. 2d 994, 997 (W.D. Wis. 2009); *see also Iqbal*, 129 S. Ct. at 1949 ("A pleading that offers 'labels and conclusions' or 'a

---

[5] Power Solutions actually asserts six causes of action but the fifth and sixth causes -- tortious interference with a contract and tortious interference with contractual relations -- appear to be the same.   PowerPlus questioned the logic for the separate counts in its opening brief (Def.'s Br. (dkt. #83) 28), and Power Solutions failed to offer any response or explanation for these two separate claims.   Accordingly, the court will treat counts V and VI as one claim -- tortious interference with contracts.

formulaic recitation of the elements of a cause of action will not do.'") (quoting *Twombly*, 550 U.S. at 555).

Plaintiff does not fare much better in its formulation of this court's role in reviewing motions to dismiss. Even if plaintiff's allegations are sufficient to place defendants on notice, the allegations -- rather than some hypothetical scenarios -- must state a claim upon which relief may be granted. "[A] complaint that satisfies Rule 8(a)'s pleading requirements might still warrant dismissal under Rule 12(b)(6) if the facts pled cannot result in any plausible relief." *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 465 (7th Cir. 2010) (internal quotation marks and citation omitted).

This latter point may be significant given PowerPlus's contention that all of Power Solutions' claims should be dismissed for failure to plead any plausible relief for PowerPlus's alleged torts and breach of contract. Plaintiff Power Solutions alleges that because of defendants' actions, Power Solutions "has been and will continue to be severely and irreparably damaged" and that Power Solutions "does not have an adequate remedy at law for the harm and damage that Defendants have caused by [their] actions." (3d Am. Compl. (dkt. #78) ¶¶ 42-43, 46-47, 50-51; *see also id.* at ¶¶ 54-55, 59-60, 64-66.)

Viewing the complaint in its entirety and not simply focusing on the specific damages' allegations in each count, it is plausible that the alleged conduct complained of would result in lost customers and lost revenue, which may entitle plaintiff to damages. *Cf. Sharp Electronics Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 512-13 (7th Cir. 2009) (affirming dismissal where plaintiff failed to explain how defendant's alleged breach of a

fiduciary duty could have caused damage). Moreover, this is not a case like *Kim v. Carter's Inc.*, 598 F.3d 362, 364-66 (7th Cir. 2010), where the statutory scheme covering the plaintiff's claim only awards relief for actual damages and, therefore, a plaintiff must plead actual monetary damages for the plaintiff's claim to survive. Nor at the motion to dismiss stage must Power Solutions *demonstrate* or *prove* damages, or a causal connection between its damages and PowerPlus's conduct. (Def.'s Br. (dkt. #83) (citing *Mercury Records Prods., Inc. v. Economic Consultants, Inc.*, 64 Wis. 2d 163, 174, 218 N.W.2d 705 (1975), for the proposition that a "plaintiff must prove 'commercial damage' under a common law misappropriation claim).)

## II.  Misappropriation of Trade Secrets and Confidential Information (Counts I and II)

Plaintiff alleges that "Defendants have stolen [Power Solutions'] trade secrets," and that "Defendants have misappropriated [Power Solutions'] confidential information in violation of Wisconsin law." (3d Am. Compl. (dkt. #78) ¶¶ 41, 45.) Both parties discuss Count I and Count II together in their briefs. While the misappropriation or theft component of these two claims may be the same, *what* has been misappropriated must be examined separately. The Uniform Trade Secrets Act provides an exclusive remedy for misappropriation of trade secrets: "Except as provided in par. (b), this section displaces conflicting tort law, restitutionary law and any other law of this state providing a civil remedy for misappropriation of a trade secret." Wis. Stat. § 134.90(6)(a). Paragraph (b), however, provides in relevant part that "[t]his action does not affect . . . [a]ny civil remedy not based upon misappropriation of a trade secret." Wis. Stat. §

134.90(6)(b); *see also Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 33, 294 Wis. 2d 274, 7171 N.W.2d 781 ("[A]ny civil tort claim not grounded in trade secret, as defined in the statute, remains available."). Therefore, in order to evaluate these two separate claims, the claim as to "trade secrets" must be evaluated separately from that of "confidential information."

In reviewing the complaint, it appears to the court that plaintiff alleges two theories in support of these claims. First, Power Solutions alleges that S.R. Bray improperly retained certain confidential information, and that PowerPlus subsequently acquired the "Retained Information," currently controls and possesses it, and is using it to compete with and to the detriment of Power Solutions. (*Id.* at ¶¶ 18-20.) Second, Power Solutions alleges that PowerPlus has obtained "more" confidential information through the actions of defendants Wait and Schiele, current employees and former employees of Power Solutions. (*Id.* at ¶¶ 31-39.)

In its brief in support of the motion to dismiss, PowerPlus focuses almost exclusively on the first theory. PowerPlus contends that Power Solutions cannot state a claim for trade secret or misappropriation of confidential information based on this theory because at the point PowerPlus allegedly acquired the Retained Information, Power Solutions was not in existence and, therefore, could not have misappropriated Power Solutions' trade secrets or confidential information. Wisconsin's Uniform Trade Secrets Act, however, does not limit "misappropriation" to *acquiring* a trade secret through improper means. Rather, misappropriation also encompasses:

> (b) Disclosing or using without express or implied consent a
> trade secret of another if the person did any of the following:

13

. . .

> 2.  At the time of the disclosure or use, *knew or had reason to know* that he or she obtained knowledge of the trade secret through any of the following means:
>
> a. Deriving it from or through a person who utilized improper means to acquire it.

Wis. Stat. § 134.90(2)(b) (emphasis added).

Here, Power Solutions alleges that S.R. Bray improperly retained trade secrets and/or confidential information it was required to transfer to CMA.  Power Solutions also alleges that PowerPlus "has no right or authority to posses or use the Retained [I]nformation."  Although PowerPlus may not have acquired the "Retained Information" under improper means, its continued possession and use may constitute "misappropriation" if it knew or had reason to know S.R. Bray and CMA acquired or retained it improperly given PowerPlus' overlapping ownership with these companies, plaintiff has plead enough to go forward on claims under Wis. Stat. § 139.40 and common law misappropriation of confidential information.[6]  Power Solutions' second theory that defendants acquired PowerPlus's trade secrets or confidential information through actions of Power Solutions' former employees also states a plausible theory of misappropriation.

The question remains, however, whether Power Solutions has sufficiently plead (1) what trade secrets or confidential information are at stake and (2) whether the

---

[6] In discussing count I and count II together, the parties offer no basis for treating the misappropriation element of the common law claim differently than that of the statutory claim, and the court could find no basis for doing so either.

information allegedly misappropriated constitutes a "trade secret" as that term is defined in Wis. Stat. § 134.90 (1)(c). Specifically, in order to prove that particular information is a trade secret, Power Solutions "must demonstrate that it is valuable, not known to others who might profit by its use, and has been handled by means reasonably designed to maintain secrecy." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, (7th Cir. 2002) (examining Wis. Stat. § 134.90(1)(c)).

The complaint alleges that PowerPlus acquired from S.R. Bray via CMA "certain of [J.T. Packard's] confidential information, trade secrets and other business information." (3d Am. Compl. (dkt. #78) ¶ 18.) The complaint also specifically alleges the type of information transferred by Schiele and Wait to PowerPlus. Schiele allegedly transferred customer contact information, marketing materials, customer contract and bid information, maintenance procedures and other customer account information. (3d Am. Compl. (dkt. #78) ¶ 35.) Wait allegedly transferred Power Solutions-developed procedures for service and repair of client equipment, a matrix containing personnel information used in connection with providing field service technician support to clients, customer contact lists, and other processes and procedures, some specific to individual clients. (*Id.* at ¶ 31.) Viewing the complaint as a whole, this level of detail is more than sufficient to provide PowerPlus with notice of the information at stake. "If Defendant needs more specificity about the nature of the trade secrets allegedly misappropriated, it can obtain it through discovery." *See Radiator Express Warehouse, Inc. v. Shie*, 708 F. Supp. 2d 762, 767 (E.D. Wis. 2010) (alteration omitted) (internal quotation marks and citation omitted).

15

Moreover, it is at least plausible that some of this information may constitute a trade secret.  At this stage in the case, Power Solutions need not *prove* that some of the information constitutes trade secrets.  Ultimately, this burden may be too difficult for Power Solutions to carry,[7] but it need not cross that road yet.  Accordingly, as to Counts I and II of the Third Amended Complaint, defendant's motion to dismiss is denied.

### III.    Conversion

Power Solutions alleges that "Defendants' conduct and actions with respect to [Power Solutions'] confidential information and trade secrets, as described above constitutes wrongful conversion of [Power Solutions'] property and assets, in violation of Wisconsin law."  (3d Am. Compl. (dkt. #78) ¶ 49.)  Under Wisconsin law, the elements of conversion are: "(1) intentional control or taking of property belonging to another, (2) without the owner's consent, (3) resulting in serious interference with the rights of the owner to possess the property."  *H.A. Friend & Co. v. Prof'l Stationary, Inc.*, 2006 WI App 141, ¶ 11, 294 Wis. 2d 754, 720 N.W.2d 96.

As an initial point, to the extent the conversion claim is premised on theft of trade secrets, it is preempted by the Uniform Trade Secrets Act, Wis. Stat. 134.90(6) as explained above.  With that independent reason for narrowing plaintiff's claim aside, the remaining cause of action is still defective.  Power Solutions has failed to allege -- nor can

---

[7] *See, e.g.*, *Corporate Express Office Products, Inc. v. Brown*, No. 00-C-608-C, 00-C-666-C, 2001 WL 34381111, at *11 (W.D. Wis. July 18, 2001) ("Absent some unique circumstance, customer information is not protected as a trade secret unless the employer shows that the information is not reproducible easily or is kept confidential.").

it plausibly do so -- that the trade secrets and confidential information allegedly stolen by PowerPlus "seriously interfere[ed]" with Power Solutions' rights to "possess the property." *H.A. Friend & Co.*, 2006 WI App 141, ¶ 11.  Power Solutions pled that the individual defendants emailed documents from their Power Solutions email accounts to their personal accounts.  Such an allegation does not lead to a plausible inference that these former employees took the only copy of the document with them, thus depriving Power Solutions of use of the document.

> [W]here the alleged converter has only a copy of the owner's property and the owner still possesses the property itself, the owner is in no way being deprived of the use of his property. The only rub is that someone else is using it as well.

*FMC Corp. v. Capital Cities/ABC Incorp.*, 915 F.2d 300, 303 (7th Cir. 1990).[8]  Stated another way, Power Solutions does not allege that it has lost use of the information allegedly obtained by PowerPlus by means of Power Solutions' former employees.  The court will, therefore, grant defendant's motion to dismiss Count III of the.

## IV.    Breach of Contract

---

[8] Power Solutions contends that the court should disregard *FMC Corp.* because the Seventh Circuit was examining conversion under California law.  But Power Solutions offers no basis for distinguishing California law from Wisconsin law, nor does one appear to exist.   Conversion under either state's common law requires that the plaintiff demonstrate that it has been deprived of use of the converted property.  Power Solution's alternate argument that "the Court must assume that [Power Solutions] can prove that [PowerPlus] took original information, not just copies" is similarly unavailing.  Power Solutions has not plead -- and there is no reasonable basis for such an inference -- that PowerPlus somehow obtained the originals of the confidential information at issue.

Power Solutions also alleges that PowerPlus breached the terms of the ICA by soliciting clients and employees of Power Solutions. There is a glaring problem with this claim. The parties to the ICA were PowerPlus and J.T. Packard, so Power Solutions, as a non-party, cannot enforce its terms. *Sussex Tool & Supply, Inc. v. Mainline Sewer & Tater, Inc.*, 231 Wis. 2d 404, 409, 605 N.W.2d 620, 622-23 (Ct. App. 1999) ("The general rule is that only a party to a contract may enforce it.").

Perhaps recognizing this flaw, Power Solutions alleges that the ICA was transferred to it via the APA. (3d Am. Compl. (dkt. #78) ¶ 22.) In response, PowerPlus flatly states that the APA did not transfer the ICA to Power Solutions. This should, of course, be easily resolved by reference to the APA. Yet in its opposition to the motion to dismiss, Power Solutions fails to identify any provision supporting its pleading. "If [judges] are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendant's reasoning." *Kirksey v. R. J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999). This is especially true here, where the APA is some 375 pages long. Having been put in issue, it is plaintiff's, not the court's, responsibility to scour this agreement for evidence.

In any event, Power Solutions seems to abandon this allegation in its opposition brief, instead pursuing a different argument apparently premised on an "oral modification of a contract." (Pl.'s Opp'n Br. (dkt. #87) 15-16.) "There are numerous sets of facts by which [Power Solutions] could prove that it and [PowerPlus]: (1) agreed (either orally o[r] by their conduct) that the [ICA] could be enforce[d] by [Power Solutions] against

[PowerPlus]; and (2) that the non-compete provision of the [ICA] was enforceable against [PowerPlus] as to [Power Solutions'] customers (which are the same as J.T. Packard's customers)." (*Id.* at 16.)  But Power Solutions does not plead any subsequent modification (oral or otherwise), and cannot avoid dismissal based on hypothetical arguments raised in an opposition brief. *See Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002) (holding that district court is constrained to pleadings in decision Rule 12(b)(6) motion).  Moreover, the ICA also contains two integration provisions that make subsequent oral modifications implausible.[9]  Accordingly, the court grants PowerPlus's motion to dismiss Count IV of the Third Amended Complaint, breach of contract, with prejudice.

### V.    Tortious Interference with Contracts

Finally, Power Solutions alleges "PowerPlus has tortiously interfered with the contracts [Power Solutions] has with its customers (including without limitation the Customers under the ICA) and with its employees."  (3d Am. Compl. (dkt. #78) ¶ 57.)  Earlier in the complaint, Power Solutions also alleges -- in a conclusionary fashion -- "PowerPlus, and its employees, members and representatives, have engaged in conduct amount[ing] to tortious interference with contract and contractual relations by, among

---

[9] The ICA states:  (1) "This Amendment may only be modified in writing, signed by both parties," and (2) "NO VERBAL REPRESENTATION OF ANY SALESPERSON, AGENT, OFFICE OR EMPLOYEE OF EITHER PARTY SHALL OPERATE TO VARY THE WRITTEN TERMS HEREOF.  ANY ALTERATIONS OR MODIFICATIONS MUST BE IN WRITING, REFERENCE THIS AGREEMENT, AND BE SIGNED BY BOTH PARTIES DULY AUTHORIZED REPRESENTATIVES."  ((Bjelajac Decl., Ex. A (dkt. #84-7) ¶¶ 22, 23 (emphasis in original).)

other things: (a) interfering with the employment relationships [Power Solutions] has with its employees; and (b) interfering in the relationships [Power Solutions] has with its customers." (*Id.* at ¶ 30.)  As support for this allegation, Power Solutions states that a former employee of Power Solutions and current PowerPlus employee, James Nolden, stated several times on his last day of employment with Power Solutions that, "as a PowerPlus employee, he intended to 'destroy' [Power Solutions]." (*Id.*)

Under Wisconsin law, the elements of a tortious interference with a contract claim are: "(1) the plaintiff had a current or prospective contractual relationship with a third party; (2) the defendant interfered with that contractual relationship; (3) the interference was intentional; (4) a causal connection exists between the defendant's interference and the plaintiff's damages; and (5) the defendant was not justified or privileged to interfere." *Wolnak v. Cardiovascular & Thoracic Surgeons of Cent. Wis., S.C.*, 2005 WI App 217, ¶ 17, 287 Wis. 2d 560, 706 N.W.2d 667.  "Tortious interference with a contract occurs when someone intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract." *Wausau Med. Ctr., S.C. v. Asplund*, 182 Wis. 2d 274, 297, 514 N.W.2d 34, 44 (Ct. App. 1994) (internal citations and quotations omitted) (citing Restatement (Second) of Torts § 766 at 7 (1979)).[10]

---

[10] Under Wisconsin law, breach of the underlying contract may not be a prerequisite for finding tortious interference, but here, plaintiff does not plead interference with some other right.  *See Tele-Port, Inc. v. Ameritech Mobile Communications, Inc.*, 49 F. Supp. 2d 1089, 1093 (E.D. Wis. 1999).  For example, Power Solutions does not plead that PowerPlus's conduct made Power Solutions' "performance of the conduct more expensive or onerous." *Id.*

Power Solutions' tortious interference claim fails for two reasons.  First, as to the tortious interference with an employment contract claim, Power Solutions fails to allege that employment contracts relevant to this claim actually existed.  Absent such an allegation, plaintiff's claim is not plausible.  Second, as to the tortious interference with customer contract claim, Power Solutions fails to allege sufficient facts to place PowerPlus on notice as to which customers and contracts are at issue.  Such facts are necessary for PowerPlus to determine whether it was justified or privileged in allegedly interfering with the contract or contracts.

Accordingly, the court will dismiss Count V (and duplicative Count VI) for failure to meet the pleading requirements pursuant to Rule 8.

## VI.    Leave to Amend Complaint

Both parties address whether the court should allow plaintiff to file an amended complaint if the court grants defendant's motion to dismiss.  As for Power Solutions' conversion and breach of contract claims, any amendment would be futile.  Power Solutions has effectively plead itself out of court on those claims.  *See, e.g.*, *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008).  As discussed above, plaintiff's allegations to date establish that it never lost use of the confidential information to support its conversion claim.  Moreover, by failing to point to the APA provision which transferred the ICA to Power Solutions, plaintiff has lost its opportunity to save its breach of contract claim through amended pleadings.

21

The court dismissed plaintiff's tortious interference claim, however, due to the insufficiency of the pleadings, which arguably could be addressed through an amended complaint.  Still, the court will not grant leave to file a Fourth Amended Complaint. Given the fast-approaching trial date (just a little over two months away) and plaintiffs' failure to correct these obvious deficiencies in the pleading to date, the court will not modify the current scheduling order to allow for an amendment.[11]

## ORDER

IT IS ORDERED that:

1) defendant S.R. Bray, LLC d/b/a PowerPlus's  motion to dismiss (dkt. #82) is GRANTED IN PART AND DENIED IN PART as provided above; and

2) defendant S.R. Bray. LLC d/b/a PowerPlus's motion to strike (dkt. #82) is DENIED.

Entered this 31st day of March, 2011.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[11] Although defendant's motion to dismiss has been pending for some time, at least part of the reason for the delay in issuing the opinion is because of the parties' actions.  The parties contacted the court in November asking the court to delay issuing any opinion on this motion because they were close to settlement.  After significant time had passed, the court contacted the parties about the status of the settlement, and only at that time, did the court learn that the settlement fell through.